**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| XY, LLC, | § | |
| | § | |
| Plaintiff/Counter Defendant, | § | |
| | § | |
| v. | § | |
| | § | |
| TRANS OVA GENETICS, LC, | § | |
| | § | Civil No. 1:13-cv-00876-WJM-BNB |
| Defendant/Third Party | § | |
| Plaintiff/Counter Claimant, | § | |
| | § | |
| v. | § | |
| | § | |
| INGURAN, LLC | § | |
| | § | |
| Third Party Defendant | § | |

**XY, LLC's REPLY CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I. INTRODUCTION ..........................................................................................................1

II. TRANS OVA MISINTERPRETS FEDERAL CIRCUIT LAW..........................................1

III. FACTUAL AND LEGAL ERRORS PERVADE TRANS OVA'S CONSTRUCTIONS..3
   A. The "Single Torsional" Terms In The Nozzle Patents.............................................3
   B. The "Elliptical" Terms In The Nozzle Patents .......................................................5
   C. The "Establishing A Sheath Fluid" Term ................................................................6
   D. The "Chemically Coordinating" Terms In The Fluid Composition Patents............7

IV. CONCLUSION............................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002)..........................................................................................x

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012)..........................................................................................x

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010)..........................................................................................x

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013)..........................................................................................x

*In re Burke, Inc.*,
    No. 92–1173, 1993 WL 92579 (Fed. Cir. Mar. 31, 1993) .........................................................x

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)............................................................................................x

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009)..........................................................................................x

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007)..........................................................................................x

*Raytheon Co. v. Roper Corp.*,
    724 F.2d 951 (Fed. Cir. 1983)............................................................................................x

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005)..........................................................................................x

*SanDisk Corp. v. Kingston Tech. Co.*,
    695 F.3d 1348 (Fed. Cir. 2012)..........................................................................................x

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
    607 F.3d 784 (Fed. Cir. 2010)............................................................................................x

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004)............................................................................................x

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003)..........................................................................................x

*Z4 Techs., Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007)..............................................................................................x

**Other Authorities**

Manual of Patent Examining Procedure (M.P.E.P.) § 201.06 ("Divisional Application") .............x

XY, LLC submits this Reply Brief pursuant to the Court's modified Scheduling Order (Dkt. Nos. 24, 107) and in response to Trans Ova's Claim Construction Brief (Dkt. No. 156).

## I. INTRODUCTION

As expected, Trans Ova's brief all but ignores the claim language and proceeds as though specific disclosed embodiments, not the claims, define the metes-and-bounds of the invention. Regarding the nozzle patents, Trans Ova mistakes a single embodiment for the "essence" of the invention and proceeds to limit all the claims to this mistaken "essence," although the Federal Circuit has repeatedly warned against "essence"-based claim interpretation. Regarding the cushioning patent, Trans Ova erroneously imports a chemical composition limitation into a claim that says nothing about chemical compositions, based on a misguided view that every claim in related patents must cover the same invention. Finally, regarding the fluid composition patents, Trans Ova ignores the specification's broad language, misreads the prosecution history, and proposes—contrary to Federal Circuit precedent—that an examiner's unilateral statement limits the scope of the claims. XY respectfully submits that Trans Ova's proposed constructions are unsupportable.

## II. TRANS OVA MISINTERPRETS FEDERAL CIRCUIT LAW

XY set forth the proper claim construction framework in its opening brief but takes this opportunity to address several incorrect legal propositions advanced by Trans Ova. First, as the basis for importing a "gradual" limitation into the "single torsional" nozzle claims, Trans Ova proposes that patent claims are limited to the "essence" of the invention. Trans Ova Br. at 7-9. The Federal Circuit has flatly rejected this position. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (error to construe claims based on the "heart" of the invention because the invention "is defined by the claims"); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) (error to necessarily limit all claims to the "essence" of the

invention); *cf. MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) (error to limit claims to an "essential element of the invention" when claims had no "textual reference" to the element). Thus, Trans Ova's only argument for construing the claims to require a "gradual" twisting force is legally flawed from the start.

Trans Ova makes a second legal error in its analysis of the prosecution history for the fluid-related patents. To limit "sheath fluid" to "a 2.9% sodium citrate composition for the sorting of bovine sperm cells or a HEPES buffered medium for the sorting of equine sperm cells," Trans Ova argues that "XY acquiesced" to the "examiner's narrow interpretation" by not "comment[ing] on [the] statement of reasons for allowance . . . ." (citing *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) and *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978 (Fed. Cir. 1999)). Trans Ova Br. at 15. Trans Ova neglects to mention that the Federal Circuit rejected this *same* argument, based on the *same TorPharm* and *Elkay* cases, almost ten years ago. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1343-48 (Fed. Cir. 2005). Contrary to Trans Ova's position, *Salazar* holds that "the applicant's silence to the examiner's remarks in the Examiner's Statements of Reasons for Allowance . . . do[es] not amount to a clear disavowal of claim scope by the applicant," for "the examiner's unilateral remarks alone do not affect the scope of the claim . . . ." *Id.* at 1347. "*Torpharm* does not hold that a patentee's silence in the face of an examiner's unilateral statements in a Notice of Allowance amounts to a clear disavowal of claim scope." *Id.* at 1346. While an examiner's reasons for allowance may provide context in analyzing whether the *applicant* disclaimed claim scope, *see id.* (distinguishing *Elkay*), "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 n.6 (Fed. Cir. 2013). As will be discussed,

2

XY rejected, not adopted, the examiner's suggestion to limit the claims as proposed by Trans Ova. There was no disclaimer.

Finally, Trans Ova states that "claim differentiation" just "creates a presumption" and is not a hard-and-fast rule. Trans Ova Br. at 6. But "[w]here . . . the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim, the doctrine of claim differentiation is at its strongest." *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012) (citation omitted). This is the case for many of the asserted claims, so the presumption is particularly strong here.

### III. FACTUAL AND LEGAL ERRORS PERVADE TRANS OVA'S CONSTRUCTIONS

#### A. THE "SINGLE TORSIONAL" TERMS IN THE NOZZLE PATENTS

Trans Ova ignores the cardinal principle of claim construction in restricting the nozzle patent claims to require a "gradual" (or "gentle") twisting force: claim construction always begins with the words of the claim. *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007). The disputed claims require a "single torsional"—not a "gradual torsional"—force. The claims do not use the word "gradual," or "gentle," or anything of the sort.

To import a "gradual" limitation into the "single torsional" claims, Trans Ova proclaims that "a gentle or gradual orienting force is the essence of the single torsional orientation nozzle invention," and the claims should be limited to this "essence." Trans Ova Br. at 9. Trans Ova is wrong on both the facts and the law. As discussed *supra*, the Federal Circuit has repeatedly rejected a claim construction methodology based on the "essence" of an invention. *See Allen Eng'g*, 299 F.3d at 1345; *Raytheon*, 724 F.2d at 957. An "essence"-based analysis is improper because it "would leave courts largely unconstrained in defining, and the public uncertain as to the scope of, the patented invention for infringement purposes." *In re Burke, Inc.*, No. 92–1173, 1993 WL 92579, at *3 (Fed. Cir. Mar. 31, 1993) (unpublished) (citing *Raytheon*).

3

Moreover, Trans Ova ignores a substantial portion of the shared nozzle specification in arriving at its narrow view of the "essence" of the invention. Although the nozzle patents share the same specification, they cover different inventions: the "single torsional" invention and the "axial motion" invention.[1] Indeed, the patents are a series of "divisionals," in which "later application[s] for an independent or distinct invention [are] carved out of a pending application . . . ." M.P.E.P. § 201.06. Employing a gentle or gradual force is just one of these "independent or distinct" inventions. *Id.* As taught by the nozzle specification, one could also reduce the stress by twisting the cells once (a "single twist") instead of twice. For example, "the present invention" identifies "either inappropriate handling forces . . . or the existence of a second torsional force" as unnecessarily stressing the cells.[2] "As to the accelerative forces applied," "abrupt transitions" may be disfavored.[3] "As to the orientation aspect," prior nozzles "unnecessarily twisted" the oriented particles "a second time," thus "doubling" the stress.[4]

Therefore, the "orientation aspect" of the invention involves twisting the cells only once; hence the "single torsional" terminology used in the specification and disputed claims. The claims do not require the "single twist" to be "gradual" or "gentle." A "non-gradual" twist would still reduce stress by half in comparison to two "non-gradual" twists. A "gradual" twist may be preferred, but it is not required. As recognized by Trans Ova, Br. at 7, XY's improved nozzle "can comprise either or both" an "accelerative force feature" and/or a "single torsional orientation" feature.[5] Trans Ova's proposed construction inappropriately conflates the two.

---

[1] *See* '745 patent, Col. 7, line 23 – Col. 10, line 62 ("single torsional" embodiment); Col. 10, line 63 – Col. 14, line 16 ("axial motion" embodiment).

[2] *Id.* at Co. 3, lines 54-58.

[3] *Id.* at Col. 3, lines 58-61.

[4] *Id.* at Col. 3, lines 61-65.

[5] *Id.* at Col. 3, lines 47-53.

4

The specification confirms the distinction between a "gentle" acceleration and a "single torsional" force. For example, the Abstract of the '745 patent states that the inventive nozzle "can both gently accelerate the cells and can include an elliptical-like, single torsional interior surface element…" This statement would make no sense if "single" meant "gentle." The specification likewise confirms that "gentle" acceleration is optional, not required:

> Changes in acceleration or velocity can occur when the axial motion surfaces change. These changes can be **abrupt or gentle**. Naturally **some embodiments** of the present invention prefer the latter.[6]

This teaches directly away from Trans Ova's proposal to limit all embodiments to a "gentle" twist.

Trans Ova's reliance on a portion of the specification discussing "the present invention" to limit the claims to "powerful yet gentle orientation forces" is similarly misguided. Trans Ova Br. at 8 (citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1383 (Fed. Cir. 2009) (Lourie, J., dissenting)). Leaving aside the fact that Trans Ova's support is a dissent, the specification reveals that "the present invention" encompasses many different embodiments. For example, "the present invention" may deal with "either . . . inappropriate accelerative forces, or the existence of a second torsional force . . . ."[7] This and the other broad disclosures already discussed negate Trans Ova's effort to limit all the claims to require a "gradual" twist. *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 793 (Fed. Cir. 2010) (in claim construction, the specification's "more general statements trump" specific embodiments).

## B. THE "ELLIPTICAL" TERMS IN THE NOZZLE PATENTS

Trans Ova argues that the specification defines "elliptical-like" to encompass "close to" rectangular shapes, and that this lexicography governs the scope of the claims. Trans Ova Br. at

---

[6] *Id.* at Col. 12, lines 10-13 (emphasis added).

[7] *Id.* at Col. 3, lines 54-58.

5

10. But Trans Ova (again) ignores the actual claim language. As XY explained in its opening brief, the broadest claims in dispute recite "an ellipse-shape or an oval-shape," not an "elliptical-like" shape. These claims originally recited "elliptical-like," but no longer do. Therefore, the fact that the specification may define "elliptical-like" to encompass "close to a rectangle-shape" no longer informs the claim construction analysis. Trans Ova has no answer to this argument.

C. **THE "ESTABLISHING A SHEATH FLUID" TERM**

Trans Ova's proposed construction of "establishing a sheath fluid" reveals how far Trans Ova is willing to go to improperly import limitations into the claims. The specification shared by the '920, '860, and '867 patents discloses many embodiments of the invention that can be used alone or in combination: "Various techniques and substances are represented but . . . various combinations and permutations can be used in the manner which may be optimized for performance . . ."[8] "[O]ne embodiment" concerns "coordinating" the sheath fluid with the "pre-sort" and/or "post-sort" fluid environments.[9] "A separate aspect" involves "cushioning" the cells as they are collected.[10]

The '920 patent claims are directed to the "cushioning" embodiment, not the "chemically coordinating" embodiment. Patentees routinely claim different embodiments of an invention in different claims. *See Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is often the case that different claims are directed to and cover different disclosed embodiments.") (citation omitted). The cushioning claims mention nothing about "coordinating" the fluids with anything. The limitation in question states, in its entirety, "establishing a sheath

---

[8] '867 patent, Col. 4, lines 33-38.

[9] *Id.* at Col. 7, lines 47-63.

[10] *Id.* at Col. 9, line 56 – Col. 10, line 47.

6

fluid to create a sheath fluid environment for said viable sperm cells."[11]  Yet Trans Ova seeks to append "by presenting a 2.9% sodium citrate composition for the sorting of bovine sperm cells or presenting a HEPES buffered medium for the sorting of equine sperm cells" onto the end of the cushioning claims, ignoring the specification's teaching that the cushioning embodiment is "separate" from the chemically coordinating embodiment.[12]  This is entirely improper.

Trans Ova's only argument is that "the '920 patent claims cannot embrace a broader invention as to sheath fluid than claimed in the predecessor '867 and '860 patents."  Trans Ova Br. at 16.  Of course they can, at least because the '920 patent claims the cushioning invention, not the coordinated sheath fluid invention.  Trans Ova ignores that "[i]t is not necessary that each claim read on every embodiment."  *Baran*, 616 F.3d at 1316.  And as discussed in the following section, Trans Ova's constructions improperly restrict the "chemically coordinating" claims, too.

### D.  THE "CHEMICALLY COORDINATING" TERMS IN THE FLUID COMPOSITION PATENTS

As explained in XY's opening brief, the specification instructs that the specific fluid compositions Trans Ova seeks to import into the claims are exemplary, not limiting.  Trans Ova argues that the claims must be limited to the exemplary compositions because a broader construction would encompass the prior art, in particular the 1991 Johnson patent.[13]  Trans Ova Br. at 15.  Trans Ova is incorrect because Johnson does not teach "chemically coordinating" the fluids at all, as XY argued to the PTO.[14]  What matters is coordinating the fluids to reduce stress on the cells, not the compositions of the fluids being coordinated.

XY's fluid composition patents acknowledged Johnson's contribution to the art, but XY went further.  In particular, Johnson taught that the sheath fluid "must be electrically conductive

---

[11] '920 patent, Claim 1, step b.

[12] '867 patent, Col. 9, line 56 – Col. 10, line 47.

[13] Trans Ova's Exh. 1, U.S. Patent No. 5,135,759 ("Johnson").  The Johnson patent was actually issued in 1992.

[14] Trans Ova's Exh. 6, at 18.

7

and isotonic" and "free from sugars and excess salts," for example a phosphate buffered saline-based solution. Johnson, 4:44-50. As a collector fluid, Johnson used an egg yolk extender containing, among other things, dextrose (a sugar). *Id.* at 4:50-58; 6:42-47. Johnson did not coordinate the fluids to reduce stress on the sperm cells. That was XY's invention, as explained in XY's specification. For example, as shown in Figure 3, "the prior art may experience vastly different chemical factor environments" throughout the cell sorting process, while "the cells in the present invention may experience a much lower level of stress" because the fluids "may be chemically coordinated . . ."[15]

The prosecution history similarly shows XY distinguishing Johnson as failing to teach chemically coordinating the fluids. In prosecuting the '860 patent, XY stated:

> Neither the Johnson, Karabinus, or Catt references disclose the elements of "chemically coordinating a sheath fluid to create a sheath fluid environment for said cells which is coordinated with both a pre-sort and a post-sort cell fluid environment" (independent claim 92 [now 1]) or "chemically coordinating said collector fluid to create an ending collector fluid environment for said cells which is coordinated with a pre-sort fluid environment" (independent claim 105 [now 32]) as defined by the applicants description, as discussed above.[16]

XY stressed that the "specific examples" Trans Ova seeks to import into the claims merely "illustrate the broader generic inventive concept recited" in the claims:

> The examiner even indicates that the **specific examples** provided by the applicant in the description of using 2.9% sodium citrate and HEPES-buffered medium as sheath fluids **to illustrate the broader generic inventive concept recited by independent claim 92 [now 1]** are not disclosed [sic] by the remaining references.[17]

It is hard to imagine how XY could have stated more clearly that the claims are not limited to a 2.9% sodium citrate composition or a HEPES-buffered medium. And on the very next page, XY

---

[15] '867 patent, Figure 3; Col. 8, lines 16-41.

[16] Trans Ova's Exh. 6, at 18.

[17] *Id.* (emphasis added).

8

confirmed that XY rejected, not adopted, the examiner's suggestion to limit the claims to those compositions: "As such, the applicant fairly deserves the breadth of the independent claims as originally recited . . ."[18]

Given these clear statements rejecting the examiner's position, Trans Ova has no basis to argue that "XY acquiesced" to the examiner's statement of reasons for allowance. Trans Ova Br. at 15. To the extent Tran Ova argues that not commenting on the examiner's reasons for allowance constitutes acquiescence, the Federal Circuit has held otherwise. *Salazar*, 414 F.3d at 1347 (no acquiescence by silence).

Regarding the '867 patent's prosecution history, Trans Ova points to a statement by XY mentioning 2.9% sodium citrate and concludes that all the claims must be limited to this composition. Trans Ova Br. at 13. But read in context, it is apparent that this reference to 2.9% sodium citrate pertains to independent claim 1, which *actually recites* 2.9% sodium citrate.[19] It does not pertain to "the other claims," some of which reference other fluids.[20]

The examiner—unlike Trans Ova—correctly recognized the distinction between the different independent claims by providing different reasons for allowance for each claim:

> [The] application . . . is being allowed since none of the remaining prior art references of record teach or fairly suggest a flow cytometer system for isolating bovine sperm cells which utilizes a sheath fluid containing about 2.9% sodium citrate **[tracking claim 1]**, a flow cytometer system for isolating equine sperm cells which utilizes a sheath fluid containing a hepes buffered medium **[tracking claim 4]**, a flow cytometer system for isolating sperm cells which includes a fluid for collecting the cells after separation in the flow cytometer that contains citrate and about 6% egg yolk **[tracking claim 6]**, and a flow cytometer system for isolating sperm cells which utilizes a sheath fluid that serves to coordinate both a pre-sort and a post-sort cell fluid environment **[tracking claim 12]**.[21]

---

[18] *Id.* at 19.

[19] Trans Ova's Exh. 3, at 2 (claim 1: "a sheath fluid source which creates a sheath fluid environment for said cells which contains about 2.9% sodium citrate").

[20] *Id.* at 12.

[21] Trans Ova's Exh. 4, at 2.

9

The examiner allowed claim 12 of the '867 patent—the claim asserted in this case—because the prior art failed to teach "coordinating" the sheath fluid with the pre- and post-sort cell fluid environments, not because the sheath fluid was 2.9% sodium citrate or a HEPES-buffered medium. Trans Ova's statement that the claims were allowed based on the "specific compositions identified in the specification" is misleading. Trans Ova Br. at 14. Only the claims that recite the compositions were allowed on that basis.

Finally, to limit "collector fluid" to a fluid "that contains citrate and about 6% egg yolk," Trans Ova argues that XY acted as its own lexicographer. Trans Ova Br. at 16. To act as its own lexicographer, "the patentee must 'clearly express an intent' to redefine the term." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (citation omitted). Providing an example—which is all XY did here—does not "redefine" a term, and does not limit the claims. *See id*. at 1331. The passage quoted by Trans Ova states that citrate with 6% egg yolk provides "good results" for "bovine sperm" in "two percent egg yolk citrate."[22] This does not mean that every "collector fluid" must be citrate with 6% egg yolk. The specification confirms this just a few lines after Trans Ova's quote ends: "since the initial chemical substance content can be varied . . . , likewise the starting collection fluid environment . . . may also be varied…"[23]

## IV. CONCLUSION

For the foregoing reasons, XY respectfully requests that the Court adopt XY's constructions and reject Trans Ova's constructions.

---

[22] '867 patent, Col. 10, lines 54-58.

[23] *Id.* at Col. 11, lines 10-14.

Dated: February 14, 2014

        s/ Daniel L. Moffett
**AKIN, GUMP, STRAUSS, HAUER & FELD LLP**
KIRT S. O'NEILL
koneill@akingump.com
DANIEL L. MOFFETT
dmoffett@akingump.com
GEORGE ANDREW LEVER ROSBROOK
arosbrook@akingump.com
300 Convent Street, Suite 1600
San Antonio, Texas 78205-3732
Telephone: (210) 281-7000
Fax: (210) 224-2035

**Sweetbaum Sands Anderson PC**
JON F. SANDS
jsands@sweetbaumsands.com
MELISSA C. COLLINS
mcollins@sweetbaumsands.com
1125 Seventeenth Street, Suite 2100
Denver, Colorado 80202
Phone: (303) 296-3377
Fax: (303) 296-7343

ATTORNEYS FOR PLAINTIFF XY, LLC AND COUNTERCLAIM DEFENDANT INGURAN, LLC

**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system. As such, this document was served on all counsel who are deemed to have consented to electronic service. All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email and/or fax, on this the 14th of February, 2014.

                                         s/ Daniel L. Moffett  
                                         Daniel L. Moffett