# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 13-cv-0876-WJM-NYW

XY, LLC,

      Plaintiff / Counterclaim Defendant,

v.

TRANS OVA GENETICS, LC,

      Defendant / Counterclaim Plaintiff.

---

## ORDER DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR CONTEMPT

---

In February 2016, Plaintiff XY, LLC ("XY"), convinced a jury that Defendant Trans Ova Genetics, LC ("Trans Ova"), was infringing several of XY's patents, and that those patents are valid. (ECF No. 461.) Due to certain jury findings, XY was not entitled to a permanent injunction against Trans Ova's ongoing infringement, so the Court awarded an ongoing royalty. (ECF No. 500 at 21–28.)

Trans Ova appealed the jury's verdict (among other things) and XY cross-appealed the ongoing royalty rates set by the Court (among other things). In May 2018, the Federal Circuit affirmed the verdict and most of the judgment, but vacated the Court's ongoing royalty rates for further consideration. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282 (Fed. Cir. 2018).

In March 2019, the Court issued an order upwardly revising the ongoing royalty rates. (ECF No. 646.) The Court entered an amended final judgment consistent with that order in April 2019. (ECF No. 648.) About two months later, XY filed a Motion for

Contempt ("Contempt Motion") (ECF No. 650 (redacted public filing); ECF No. 651 (unredacted restricted filing)), which is currently before the Court. XY argues that Trans Ova is "blatantly and intentionally circumvent[ing] the Court's [royalty] rate increases." (*Id.* at 2.)[1]

For the reasons explained below, the Court denies XY's Contempt Motion without prejudice because XY failed to satisfy its duty under this District's local rules to meaningfully confer with Trans Ova before filing the motion.[2]

## I. BACKGROUND

### A.    Trans Ova's Infringing Services

Trans Ova provides non-human mammalian reproductive services, mostly to cattle farmers. These services include "semen sorting" (separating bull sperm into X cells and Y cells, so that artificial insemination will produce a calf of a specific gender) and *in vitro* fertilization ("IVF"). (ECF No. 659 at 2, ¶ 1.) Sometimes these services are combined, *i.e.*, IVF is performed with sorted semen. (*Id.* at 3, ¶ 2.) "In those cases, the semen is either sorted fresh ('conventionally-sorted') or is frozen and then sorted (*i.e.*, 'reverse-sorted')." (*Id.*) In either scenario, Trans Ova sometimes performs related services, including oocyte collection, also known as "ovum pickup," for which Trans Ova charges an "OPU fee"; and administration, or at least provision, of oocyte stimulation drugs, for which it charges an "IVF drug fee." (*Id.* ¶ 3.) "These three services—fertilization, OPU, and IVF drug delivery—are commonly referred to as the 'IVF service

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with unnumbered caption pages and exhibits with unnumbered cover pages.

[2] Consequently, Trans Ova's Motion for Oral Argument (ECF No. 661) on the Contempt Motion is denied as moot.

cycle.'" (*Id.*)

To the extent these services involve reverse-sorted semen, they infringe U.S. Patent No. 8,569,053 ("053 Patent"), and specifically claim 9 of that patent, a dependent claim that describes an IVF method involving "frozen-thawed stained sperm cells." Trans Ova stipulated that it practiced this claim of the 053 Patent (ECF No. 356 ¶¶ 3(k), 5(a); ECF No. 455 at 9–10; ECF No. 456 at 14), but challenged it at trial as invalid (*see* ECF No. 301 at 20). The jury found against Trans Ova on invalidity and so necessarily found infringement of the 053 Patent, claim 9. (*See* ECF No. 461 at 4.)

**B.    The Jury's Award of Pre-Verdict Infringement Damages**

At trial, XY's damages expert, Mr. Todd Schoettelkotte, proposed a damages model that included, among other things, assumptions and opinions about the "royalty base"—*i.e.*, the Trans Ova products and services on which it should have been paying a royalty to XY—and the royalty rates Trans Ova should have been paying on that base. Mr. Schoettelkotte's testimony assumed three successive hypothetical licensing negotiations between XY and Trans Ova. (ECF No. 470 ¶¶ 1, 4.) Of note, Mr. Schoettelkotte included the method of the 053 Patent, claim 9, as part of the royalty *base*, but assigned it no royalty *rate*. (*Id.* ¶ 14.) Mr. Schoettelkotte believed that "the broad scope of technology provided under . . . patents [licensed through] the first two hypothetical negotiations" meant that, by the time of the third negotiation (embracing the 053 Patent), "no additional royalty would [have been] assessed." (*Id.* (internal quotation marks omitted).)

As to the rest of his damages model, Mr. Schoettelkotte proposed a royalty base and a set of royalty rates that added up to $4,584,555 for pre-verdict infringement. (*Id.*

¶ 4.)  The jury awarded $4,585,000 (*see* ECF No. 461 at 9), which is manifestly a rounded-up version of Mr. Schoettelkotte's proposal.  The Court interpreted this to mean "that the jury adopted Mr. Schoettelkotte's damages analysis," or in other words, his opinions about both the royalty base and rates.  (ECF No. 500 at 23.)  No party has since challenged this assertion, either in this Court or on appeal.

## C.    Post-Verdict Assessment of an Ongoing Royalty

### 1.    XY's Royalty Motion

For reasons not relevant to relate here, the jury also found that "XY's claims for unjust enrichment and injunctive relief [were] barred by XY's unclean hands."  (ECF No. 461 at 9.)  Thus, XY could not force Trans Ova to stop using its patented technology, but neither was there any indication the Trans Ova would stop.  XY therefore filed its Motion to Set an Ongoing Royalty Rate ("Royalty Motion") (ECF No. 471).  *See also SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 807 F.3d 1311, 1332–33 (Fed. Cir. 2015) ("absent egregious circumstances, when injunctive relief is inappropriate, the patentee remains entitled to an ongoing royalty"), *vacated in part on other grounds*, 137 S. Ct. 954 (2017).

Mr. Schoettelkotte submitted a declaration in support of the Royalty Motion, opining on hypothetical negotiations of the royalty base and royalty rates in light of the jury's verdict and other changed circumstances.  (ECF No. 470.)  Among his opinions was that other witnesses' trial testimony had changed his mind about the incremental value of the 053 Patent:

> [I]t is my understanding that certain IVF services such as oocyte retrieval [*i.e.*, OPU] and [IVF] drug delivery—which have been found to be steps that are covered by the claims of the '053 Patent—are important components of Trans

4

> Ova's overall IVF service cycle.  For example, [one witness]
> testified that the '053 Patent covers drug delivery and oocyte
> retrieval.  Furthermore, [another witness] confirmed that the
> "four major steps" to the IVF cycle included "IVF drugs" and
> "oocyte collection."  [A third witness] testified that IVF when
> used with reverse sorting is "valuable stuff for farmers to
> use."

(*Id.* ¶ 14 (footnotes omitted).)  "Given the importance of [OPU and IVF drug delivery] to

the IVF cycle, Trans Ova's significant operating profit generated from these services,

and the jury's finding that [Trans Ova] infringe[s] the '053 Patent," Mr. Schoettelkotte

opined that "it would be appropriate for an-ongoing royalty rate to be assessed for use

of the '053 Patent."  (*Id.* ¶ 15.)

But assigning such a royalty was potentially problematic due to Trans Ova's

pricing and accounting practices:

> With regards to IVF services, it is important to note that
> Trans Ova generally does not invoice its customers for each
> segment of the IVF cycle.  Instead, since 2008 Trans Ova
> has utilized a "bundled" pricing structure for IVF cycle
> services.  Essentially, Trans Ova invoices its clients for one
> price for IVF cycle service, and subsequently allocates the
> bundled payment within its accounting system.  As a result,
> Trans Ova's intricate method of determining revenues for
> each component of the IVF cycle may overly complicate the
> determination of the royalty payment to XY.  Therefore, to
> simplify payment and reporting (and to ensure its accuracy),
> it may be appropriate to set an on-going royalty rate to be
> applied to all of Trans Ova's IVF service cycle revenue as
> opposed to different rates for different components.

(*Id.* ¶ 19 (footnotes omitted).)  Mr. Schoettelkotte therefore calculated "weight[ed]

. . . royalty rates" for the "IVF service cycle."  (*Id.* ¶¶ 19, 20.)

The weighted approach had two components.  The first was the reverse-sort and

fertilization portion of the IVF service cycle.  On that, he started with a 19% royalty rate

for pre-verdict infringement (the rate he proposed at trial and the rate that the jury,

through its verdict, accepted) and proposed to increase it (to account for post-verdict circumstances) by 25%, 33%, or 50%.  (*Id.* ¶ 20.)  The second component was OPU and IVF drug delivery.  On that, he could not start from the jury verdict because the jury, having adopted his damages analysis, awarded no royalty for that portion of the IVF service cycle.  He instead simply proposed royalties of 3%, 3.5%, and 4%.  (*Id.*)

Having proposed royalty rates for the individual components of the IVF service cycle, he then weighted the two components according to Trans Ova's revenue earned from the various parts of the cycle and calculated an overall weighted royalty rate that would capture his various proposed scenarios, as displayed in the following table from his declaration:

| Infringing Product | Royalty Rate (Jury Verdict) | Ongoing Royalty Rate (25% Increase) | Ongoing Royalty Rate (33% Increase) | Ongoing Royalty Rate (50% Increase) |
|---|---|---|---|---|
| GS IVF Cycle (Rev. Sort & Fert.) | 19.00% | 23.75% | 25.27% | 28.50% |
| GS IVF Cycle (Oocyte & Drug) | --- | 3.00% | 3.50% | 4.00% |
| GS IVF Cycle (Total) | 8.82%[44] | 12.63% | 13.61% | 15.38% |

(*Id.*)  Thus, for example, a 25% increase over the 19% awarded by the jury for reverse-sorting and fertilization ("Rev. Sort & Fert.") led to a proposed ongoing royalty of 23.75% for that part of the IVF service cycle.  Combining that with a proposed 3% royalty for OPU and IVF drug delivery ("Oocyte & Drug"), and then weighting the two rates based on revenue, yielded a proposed overall rate of 12.63% that would be applied to all IVF service cycle revenue, regardless of Trans Ova's internal allocation of the revenue.[3]

---

[3] The parentheticals in the header row ("25% Increase," "33% Increase," and "50% Increase") are slightly misleading.  They only apply to the "Rev. Sort & Fert." row.  The jury awarded nothing for "Oocyte & Drug," so the numbers on that row are simply

XY endorsed Mr. Schoettelkotte's proposal, which it described as follows: "To avoid the possibility of gamesmanship with the pricing [of the components of the IVF service cycle], Mr. Schoettelkotte created a blended equivalent royalty rate for the total cost of the IVF Cycle, which could be used in lieu of a royalty solely on the reverse sort and fertilization portions." (ECF No. 471 at 6 n.1.) As for products and services outside of "the reverse sort and fertilization portions," XY advocated for a proposal by Mr. Schoettelkotte to increase his 15% pre-verdict royalty rate (which he proposed at trial, and which the jury implicitly accepted) by either 25%, 33%, or 50%, yielding rates of 18.75%, 19.95%, or 22.5%. (*Id.* at 6.)

### 2.  Trans Ova's Response

Understanding Trans Ova's response requires first understanding its own post-verdict motion practice. Among the jury's many findings is that both sides breached the Licensing Agreement that had previously governed their relationship. (ECF No. 461 at 1, 2.) The same day that XY filed its Royalty Motion, Trans Ova filed a motion for judgment as a matter of law, arguing, among other things, that the jury's verdict on the contract issues must be interpreted to mean that XY breached the Licensing Agreement first, thus excusing Trans Ova's supposedly later breach—the upshot of it all being that Trans Ova still had a right to operate under the Licensing Agreement, and therefore a right to practice the XY patents. (*See* ECF No. 473.)

With this in mind, Trans Ova responded to XY's Royalty Motion by first arguing that the Court need not engage in any complicated royalty-setting analysis "because, as Trans Ova has repeatedly argued, Trans Ova already has a license to use the

---

Mr. Schoettelkotte's proposals, not a percentage increase over anything.

technology with a set royalty. . . . Accordingly, the Court need look no further than the existing license to govern the parties' post-trial business relationship." (ECF No. 485 at 1; *see also id.* at 3 ("Trans Ova has detailed the reasons that it is still an XY licensee in its other post-trial papers. . . . As such, the License is still in effect, Trans Ova cannot be liable for either breach or patent infringement, and all of XY's damages motions, including its Royalty Motion, are moot.").)

Alternatively, Trans Ova argued that the ongoing royalty rate should equal the royalty rate under the License Agreement, because that is the rate XY has charged to all of its other licensees and so is free from the speculation of hypothetical negotiations, like those proposed by Mr. Schoettelkotte. (*Id.* at 6–8.)

### 3. The Court's Ruling & Final Judgment

The Court rejected Trans Ova's argument that it remained an XY licensee. (ECF No. 500 at 3–10.)[4] Accordingly, the Court was required to set an ongoing royalty rate.

All of XY's arguments rested on the principle that the ongoing, post-verdict royalty rate could be no lower than what the jury awarded, *i.e.*, the 19% rate for reverse-sorting services, and the 15% rate for everything else. (*See* ECF No. 471 at 3–4.) The Court disagreed that ongoing rates must be no lower than the jury-awarded rates. (ECF No. 500 at 24–25.) The Court instead awarded the average between what the parties had agreed to in their previous License Agreement and what the jury awarded, which worked out to "an ongoing royalty at a rate of 12.5% of gross sales, with an additional

---

[4] For this reason, XY is disingenuous to suggest, as it does in the Contempt Motion, that Trans Ova has effectively agreed to XY's interpretation of the License Agreement and its effect on the judgments subsequently entered by this Court. (*See* ECF No. 650 at 3; ECF No. 666 at 4.) Trans Ova was arguing that the License Agreement was still in effect (an argument the Court rejected), not that the License Agreement should be somehow incorporated into the judgment.

royalty of 2% for reverse sorting services." (*Id.* at 28.) The Court said nothing about Mr. Schoettelkotte's post-verdict proposal that some value should be attributed to the 053 Patent, contrary to his trial testimony.

On April 19, 2016, the Court entered final judgment ("Original Judgment") on the jury verdict and on its ongoing royalty "at the rate of 12.5% of all gross receipts for the licensed products set forth in the parties' prior License Agreement, with an additional 2% royalty for reverse sorting services." (ECF No. 507 at 2.) Trans Ova timely appealed to the Federal Circuit (ECF No. 514) and XY timely cross-appealed this Court's decision to set an ongoing royalty rate lower than the rate awarded by the jury for pre-verdict infringement (ECF No. 519).

## D.     Royalty Dispute While Appeal is Pending

### 1.     The Parties' Correspondence

According to XY, Trans Ova began in September 2016 to send monthly reports and checks for ongoing royalties, as ordered by this Court. (ECF No. 650-1 ¶ 2.) Trans Ova's monthly reports showed that it included its OPU fee as one of the charges to customers on which it would pay a 12.5% royalty to XY. (*See* ECF No. 592-3 at 4, lower left table ("12.5% Royalty Service Sales . . . including OPU . . .").) Again, the notion of paying a royalty on the OPU fee was a deviation from the damages model that the jury accepted, and was first proposed by Mr. Schoettelkotte in his post-verdict declaration. The Court neither explicitly adopted nor rejected that proposal. Thus, unless the OPU fee was among "licensed products set forth in the parties' prior License Agreement" on which the judgment required a 12.5% royalty, or was part of the "reverse sorting services" on which the judgment required a 14.5% royalty, there was no obvious

obligation to pay a royalty on the OPU fee.  Trans Ova's choice to put it in the 12.5%
category suggests it was treating it as one of the "licensed products set forth in the
parties' prior License Agreement."

XY disagreed with some of Trans Ova's royalty calculations and sent Trans Ova
a letter to that effect in October 2016.  (*See* ECF No. 592-4.)  It is not clear from that
letter whether XY believed Trans Ova was miscalculating the OPU royalty.  The letter
asserts that Trans Ova must pay 14.5% on OPU fees associated with reverse-sorted
semen, and 12.5% on such fees associated with fresh-sorted semen (as well as on pre-
sorted frozen semen) (*id.* at 4), but XY nowhere characterizes this as something Trans
Ova was failing to do.  The letter's assertions were similar for what it described as "any
drug fees Trans Ova charges to the customer."  (*Id.*)

Later in October 2016, Trans Ova responded with a letter of its own.  (ECF No.
592-5.)  Trans Ova said that it "agree[d] [with XY] on the royalties to be paid for [the IVF
service cycle] with fresh sorted semen or sexed [*i.e.*, pre-sorted] frozen semen, with the
exception of the drug charge."  (*Id.* at 3.)  According to Trans Ova, "There is no revenue
associated with giving the [drugs] that is distinct from Trans Ova's standard OPU or
fertilization fees, which Trans Ova includes this [*sic*] in its royalty calculation pursuant to
the Court's Order."  (*Id.* at 4.)  As to OPU, however, Trans Ova stated, "We include the
ovum pickup in the royalty base," referring to the royalty base for fresh-sorted and
frozen pre-sorted semen.  (*Id.* at 3.)

    2.   <u>XY's Clarification Motion</u>

The parties' correspondence left XY unsatisfied.  In January 2017, it filed a
Motion for Clarification of the Court's Judgment on Ongoing Royalties ("Clarification

Motion") (ECF No. 592 (restricted filing); ECF No. 593 (redacted public filing)).  XY said

that "Trans Ova's first post-trial royalty report . . . makes clear that Trans Ova is still

excluding from the royalty base certain of the very same products and services that the

jury implicitly found should be included."  (ECF No. 592 at 2.)  Trans Ova was

"exploiting" the fact that the Court's order on royalties, and the final judgment, "[did] not

explicitly address the composition of the royalty base."  (*Id.*)  More specifically, XY

argued that "Trans Ova continues excluding," among other things, "certain covered

revenue components from its Gross Receipt figures, such as the payments it receives

for IVF fertilization drugs."  (*Id.* at 9.)

XY said nothing about OPU fees because (it now says) it was "[r]elying on [Trans

Ova's] express representation" about those fees in its October 2016 letter.  (ECF No.

651 at 7.)

3.  Trans Ova's Response

Trans Ova's response to the Clarification Motion mentioned OPU as an area of

agreement between the parties:

> . . . Trans Ova has sought to adhere to the [Court's] Order
> [on ongoing royalties] and faithfully apply the Court's
> analysis and conclusions to its royalty calculations. . . .
> [W]here ambiguity exists in the Order, Trans Ova has sought
> to avoid a self-serving or ungenerous interpretation.  For
> example, Trans Ova does not dispute whether all the steps
> involved in IVF are royalty-bearing.  Instead, it simply pays a
> royalty on those steps, such as ovum pick-up, where the
> steps do not use XY technology and the ovum pick-up is not
> patented.

(ECF No. 600 at 2–3.)  Trans Ova described this as part of its "best efforts to avoid

post-trial disputes, by being both transparent and evenhanded."  (*Id.* at 3.)

As for IVF fertilization drugs, Trans Ova responded that it does not profit from

selling those drugs because it provides them to customers at cost. (*Id.* at 6.) And, when Trans Ova administers the drugs, such administration "is included in [a] lab fee [for IVF services]." (*Id.*) Thus, Trans Ova "does not separately charge for administering the drug," and it "already pays XY a royalty on the lab fee when sexed semen is used for the IVF service." (*Id.*)

### 4. The Court's Deferral of a Resolution

The Court denied the Clarification Motion without prejudice. (ECF No. 613 at 3–4.) The Court held that it did not have jurisdiction to alter or amend the judgment in the manner XY was seeking while the Federal Circuit appeal remained pending. (*Id.* at 4.)

## E. Resolution of Royalty Disputes on Remand

On appeal, the Federal Circuit agreed with XY that this Court erred in its decision to set a royalty rate of 12.5% + 2% (*see* Part I.C.3, above), because those rates are lower than the 15% + 4% awarded by the jury for pre-verdict infringement and there were "no economic factors that would justify the imposition of rates that were lower than the jury's." *XY*, 890 F.3d at 1298.

### 1. Exploring Additional Motion Practice

The Court requested the parties' positions on whether further motion practice was needed in light of the Federal Circuit's resolution. (ECF No. 616.) As relevant here, XY stated that it would file "a motion to recalculate the ongoing royalty rates." (ECF No. 621 at 1.) Apparently XY expected this be a *pro forma* motion, essentially to reinstate the Royalty Motion, because it was also XY's position that "re-briefing of the ongoing royalty issue would be unnecessary and inefficient." (*Id.*) XY also "intend[ed] to file a renewed motion for clarification." (*Id.* at 2.)

Trans Ova, for its part, intended to file motions for discovery and motions to

admit into the record evidence gathered through other lawsuits involving XY, in hopes of

showing that economic factors now justify royalty rates potentially lower than those

awarded by the jury for pre-verdict infringement. (*Id.* at 2–3; *see also* ECF No. 623

(elaborating on this theory).) Trans Ova also planned to file

> [a] motion for supplemental briefing (and, if warranted, a
> hearing) on the issue of the ongoing royalty, which briefing
> would address at least the following four points: (i) the
> appropriate royalty base (i.e., the products and services to
> which any royalty rate shall apply); (ii) the appropriate royalty
> rate; (iii) the appropriate per-product minimum; and (iv) the
> scope and duration of the ongoing royalty.

(ECF No. 621 at 3.)

The Court responded with an order stating that the Federal Circuit's opinion

"foreclose[ed] the sort of re-opening of the record Trans Ova proposes." (ECF No. 634.)

"Moreover," the Court continued, "under the circumstances of this case, the Court finds

that re-opening of the record is inappropriate in any event. Accordingly, no new motion

practice is needed from either party. The Court will decide anew XY's [Royalty Motion]

. . . . The Court will also decide anew XY's [Clarification Motion]." (*Id.*)

2.    The Court's Resolution of the Royalty and Clarification Motions

The Court issued its order on March 28, 2019 ("Ongoing Royalties Order"). (ECF

No. 646.) On the question of whether IVF fertilization drugs should be a part of the

royalty base, the Court did not directly address Trans Ova's argument that it provides

those drugs that cost, or that their administration is charged through a separate lab fee

on which a royalty is already assessed. (*See* Part I.D.3, above.) Rather, this argument

was subsumed in the Court's rejection of all arguments (of which there were many)

founded on the notion that the ongoing royalty obligation must be "economically feasible

for Trans Ova." (ECF No. 646 at 5.) The Court ruled, moreover, that "[b]ecause the jury agreed with XY as to the scope of the pre-verdict royalty base, the Court, again, must assess a post-verdict royalty on the same base to avoid granting Trans Ova a windfall." (*Id.*)

As for the lingering issue of whether a royalty rate should be set for the services associated with the 053 Patent, despite Mr. Schoettelkotte's decision at trial not to estimate a royalty rate (*see* Part I.B, above), Trans Ova offered no response apart from its claims about providing IVF drugs that cost. The Court therefore "agree[d] with XY that the 053 Patent has value to Trans Ova that merits a royalty. The Court further agree[d] with Mr. Schoettelkotte's opinion that a weighted, blended rate for the entire IVF cycle is a better course of action than separate royalties for different components of the cycle." (ECF No. 646 at 12.) The Court accepted Mr. Schoettelkotte's 3% royalty scenario, which, in combination with the proposed 25% increase over the jury's royalty rate for reverse-sorting services, led to a weighted, blended royalty rate of 12.63% for the entire IVF service cycle. (*Id.* at 12–13; *see also* Part I.C.1, above.) Finally, as relevant here, the Court gave XY an April 8, 2019 deadline to submit "a proposed form of amended judgment embodying the Court's rulings regarding the royalty rates[] [and] royalty base." (ECF No. 646 at 13.)

XY submitted its form of judgment on the appointed date. (ECF No. 647.) It proposed the following language regarding ongoing royalties:

> . . . Defendant shall pay to Plaintiff an ongoing royalty for sales commencing on February 12, 2016, at the rate of 12.63% of all gross receipts for *in vitro* fertilization services that utilize reverse-sorted semen (including, but not limited to, revenues Trans Ova receives for each and every step of the *in vitro* fertilization cycle or process, including payments

> it receives for oocyte retrieval services and *in vitro*
> fertilization drugs), and at the rate of 18.75% of all gross
> receipts for all other licensed products set forth in the parties'
> prior License Agreement.

(*Id.* at 2.)

On April 11, 2019, the Court entered an amended final judgment incorporating the foregoing language verbatim ("Amended Judgment"). (ECF No. 648 at 2.)

### 3. Trans Ova's Last Report Under the Former Royalty Rates

On March 29, 2019 (the day after the Court entered the Ongoing Royalties Order), Trans Ova transmitted to XY its last quarterly report of royalties it believed it owed under the obsolete 12.5% + 2% rates awarded in the Original Judgment. (ECF No. 650-1 ¶ 2.) It is unclear if the timing of this transmission was coincidental or intentional. Regardless, with this quarterly report, Trans Ova had now sent XY quarterly reports spanning April 1, 2016, through December 31, 2018. (*Id.*) It total, the royalties disclosed in these reports added up to $4,935,841.87. (ECF No. 657-1 ¶ 2 n.3.)

### F. Disputes Leading to the Contempt Motion

### 1. Trans Ova's May 9, 2019 Letter

On May 9, 2019, Trans Ova e-mailed to XY a letter explaining a soon-to-arrive check in the amount of approximately $5.8 million, comprising:

- recalculated royalty payments from February 12, 2016 (the date of the jury verdict) through December 31, 2018;

- additional royalties owed for January 1, 2019 through March 31, 2019 (the end of the most recent quarter); and

- prejudgment interest (*i.e.*, pre-Amended Judgment interest on royalties that had accrued since the Original Judgment).

(ECF No. 650-2.)  Supporting documentation accompanied the letter, including an Excel

spreadsheet showing the prejudgment interest calculation, and "Royalty Summary

Reports and Royalty Summary Worksheets for each quarter spanning from Q1 2016

through Q1 2019 (totaling 26 PDFs)."  (*Id.* at 6.)

Trans Ova's letter began by explaining how it applied the 12.63% weighted,

blended rate awarded in the Amended Judgment:

> All ongoing royalties owed from February 12, 2016 through
> March 31, 2019 on Trans Ova's IVF Service Cycle revenue
> (gross receipts) that utilize Reverse-Sorted Semen, *i.e.*, any
> revenue generated from any of the following component
> services and/or products: (i) reverse-sorting semen;
> (ii) oocyte retrieval (a.k.a ovum pickup or "OPU"); (iii) *in vitro*
> fertilization or embryo production; and (iv) IVF drug therapy.
> The royalty rate Trans Ova has applied to such gross
> receipts is **12.63%**. . . .
>
> In the past, Trans Ova did not always break out its IVF
> Service Cycle revenue into its component parts, but rather
> only invoiced customers for the sexed embryo(s) produced
> via IVF.  In these instances, the invoiced amount subsumed
> (but did not individually list out) the various components of
> the IVF Service Cycle (*i.e.*, reverse-sorting, OPU, *in vitro*
> fertilization/embryo production, and IVF drug therapy).
> Accordingly, for any such past sales of sexed embryos
> utilizing Reverse-Sorted Semen, Trans Ova has applied a
> royalty rate of **12.63%** to those sales . . . .

(*Id.* at 2–3 (footnotes and paragraph numbering omitted; emphasis in original).)  As to

the 18.75% royalty on conventionally-sorted semen services, Trans Ova disclosed that

it was "backing out" the OPU and IVF drug components on which it had been calculating

a royalty in between the Original and Amended Judgments (*see* Parts I.D.1 & D.3,

above):

> As noted [previously in the letter], Trans Ova has not always
> broken out its IVF Service Cycle revenue into its component
> parts, but rather has at times in the past only invoiced

customers for the sexed embryo(s) produced via the IVF procedure, which charge subsumed (but did not individually list out) the various components of the IVF Service Cycle. Accordingly, for any such past sales of sexed embryos utilizing Conventionally-Sorted Semen, Trans Ova has applied a royalty rate of **18.75%** to that portion of the sale owing to the *in vitro* fertilization procedure (*i.e.*, the IVF lab production fee and, where applicable, any semen-sorting). Put another way, Trans Ova is backing out of the royalty payment that portion of the sale owing to the OPU and drug therapy components, as those are not properly part of the royalty base when Conventionally-Sorted Semen is utilized.

(ECF No. 650-2 at 3 (emphasis in original).)

2. <u>XY's June 10, 2019 Response Letter</u>

XY responded to Trans Ova's letter through a letter of its own dated June 10, 2019. (ECF No. 650-4.) XY's counsel stated that it had "now had an opportunity to consult with our client and our economic expert [Mr. Schoettelkotte] regarding Trans Ova's Accrued Ongoing Royalty reports and your May 9 letter describing how Trans Ova performed its calculations." (*Id.* at 2.) XY asserted that

Trans Ova's ongoing royalty payment is deficient by well over $1 million. Indeed, despite a sizable royalty rate increase ordered by the Court in [the Amended Judgment], Trans Ova's revised royalty calculations result in essentially the same royalty that Trans Ova has reported over the last three years using the lower royalty rate.

(*Id.*) More specifically, while supposedly using the Amended Judgment rates (12.63% and 18.75%), Trans Ova had recalculated its royalty obligation from the jury's verdict through December 31, 2018 at $4,955,161.57, which is only about $19,000 (or 0.4%) more than its total obligation for that same time period under the Original Judgment rates (12.5% + 2%). (ECF No. 651-7 ¶ 2 n.3; *see also* Part I.E.3, above.) In this light, XY exclaimed that "[t]his simply cannot be correct." (ECF No. 650-4 at 2.)

"From what we can tell," XY identified the problem as threefold. (*Id.*) The first

problem was that disclosed in Trans Ova's letter regarding OPU and IVF drug revenue:

> Both Trans Ova and XY have always considered OPU
> revenue to be part of the sexed-frozen IVF royalty base and,
> on the [Clarification Motion], the Court agreed with XY that
> the royalty base includes revenue for IVF drugs. It is
> improper and unacceptable for Trans Ova to begin
> unilaterally excluding the OPU and drug revenue now.

(*Id.*)[5]

The second problem was that "the revenue from sexed embryos sold as a product [is] nowhere to be found in Trans Ova's calculation of the Accrued Ongoing Royalties." (*Id.*) XY referred to other "letters" (apparently not the May 9, 2019 letter) in which "Trans Ova suggests that it has converted the embryo product revenues into allegedly equivalent 'service' revenues." (*Id.*) "[T]he net effect [of that conversion was] to lower the royalty owed to XY. This is improper. The [Amended Judgment] does not permit this kind of reclassification of revenues. . . ." (*Id.* at 2–3.)

The third problem, closely related to the second, was that "Trans Ova's royalty calculations do not appear to include revenue for sexed embryos sold by Progentus, the wholly-owned subsidiary Trans Ova set up specifically to sell sexed embryos after the Court's original order on ongoing royalties." (*Id.* at 3.)

XY requested a conference call no later than close of business the next day (June 11) "to discuss whether and when Trans Ova will remedy this underpayment." (*Id.* at 2.)

### 3. Conferral Efforts

The parties did not have a call on June 11. Rather, they engaged in a testy, two-

---

[5] The Court states no opinion at this time about whether XY properly interprets the Ongoing Royalties Order.

day e-mail exchange about whether XY's letter was detailed enough for Trans Ova to understand the substance of XY's disapproval, and about whether XY's haste was truly necessary. (*See* ECF No. 659-4.) XY says its haste was motivated by an SEC filing from Trans Ova's parent company disclosing the possibility of an imminent bankruptcy filing. (*Id.* at 4, 6.)[6] Trans Ova responded that it had previously consented to have XY deposit the $5.8 million disputed royalty check into the Court's Registry, "represent[ing] the bulk of any amount owed to XY—even under [XY's] analysis of Trans Ova's royalty obligations." (*Id.* at 3.)

The parties finally conferred via telephone for "one hour and eight minutes" on the afternoon of June 13. (ECF No. 650 at 17.) According to Trans Ova's later e-mail memorializing that call, the parties discussed their disagreements and then counsel for Trans Ova said that he would "like to take [XY's] views back to [Trans Ova] to discuss and then revert back to you to see if any compromise could be reached so as to obviate the need for motion practice." (ECF No. 659-5 at 3.) XY reportedly responded "that this seemed pointless, that it was clear the parties had reached an impasse, and that there was likely no room for compromise as each side had now fully articulated opposing positions." (*Id.*)

XY filed the Contempt Motion later that day, at 5:14 PM. (ECF No. 650.)[7]

## II. ANALYSIS

With exceptions not relevant here, this District's local rules require opposing

---

[6] The parties have said nothing about whether the parent company indeed filed for bankruptcy.

[7] ECF No. 650 does not, by itself, show a time stamp. The Court has consulted its internal records to confirm the filing time.

parties to "confer or make reasonable good faith efforts to confer . . . to resolve any disputed matter" "[b]efore filing a motion." D.C.COLO.LCivR 7.1(a). "[T]o satisfy the requirements of Rule 7.1A, the parties must hold a conference, possibly through the exchange of correspondence but preferably through person-to-person telephone calls or face-to-face meetings, and must compare views and attempt to reach an agreement, including by compromise if appropriate." *Hoelzel v. First Select Corp.*, 214 F.R.D. 634, 636 (D. Colo. 2003).

Whether a movant has satisfied the duty to confer in good faith depends on the circumstances of the case and the dispute in question. Here, the circumstances of the case and the dispute in question show that XY fell well short of satisfying its duty to confer.

To begin, the matters raised in the Contempt Motion are highly intricate—as the Background section, above, amply demonstrates. Trans Ova's compliance with the Amended Judgment is not simply a matter of interpreting the Amended Judgment, but also of understanding much of the history of this case and the parties' shifting positions through trial and post-verdict briefing. Even if the Court were to grant the Contempt Motion in full, it is not at all clear that such an order would prevent further disputes without further amending the Amended Judgment—*which XY drafted*—to provide much more specificity. Thus, it was an "appropriate" case to consider "compromise" before asking the Court to hold Trans Ova in contempt. *See Hoelzel*, 214 F.R.D. at 636.

Here, XY demonstrated no interest in engaging with Trans Ova in good faith on the parties' disputes. Once XY was ready to respond to Trans Ova's May 9, 2019 letter, it began demanding nearly immediate telephone conferral. When telephone conferral

took place three days later, counsel for Trans Ova told counsel for XY that he wanted to take XY's position back to his client to see if compromise was feasible. Counsel for XY characterized the proposal as "pointless" and filed the Contempt Motion before the close of business that day.

And not only that. The Contempt Motion is actually spread over two filings, the first redacted and unrestricted (ECF No. 650), the second restricted and unredacted, and filed less than ten minutes later (ECF No. 651). The two filings together include seventeen attachments. Such a substantial filing simply cannot come together rapidly. It must have been prepared and nearly ready for filing—all but a *fait accompli*—at the time of the phone conferral.

XY claimed to Trans Ova that an allegedly imminent bankruptcy filing by Trans Ova's parent company was forcing XY to move rapidly. The explanation is disingenuous. If XY truly believed that such a bankruptcy was imminent, it could not possibly have expected any contempt motion to be fully briefed, much less resolved, before that bankruptcy. And, as Trans Ova's counsel pointed out to XY's counsel, Trans Ova had agreed to allow XY to deposit the most recent disputed royalty check (of about $5.8 million) into the Court's Registry—meaning that, once negotiated by this Court, there was no longer any risk of those funds becoming unreachable.[8] Thus, there was no urgency such that XY could not reasonably wait, say, another week to hear whether Trans Ova had a reasonable compromise proposal.

The Court notes an additional relevant factor. Considering the technical nature

---

[8] The Court granted XY's motion to deposit the check into the Registry. (*See* ECF No. 652.) The Court likewise granted a subsequent motion regarding a subsequent check. (*See* ECF No. 678.)

of this nearly eight-year-old dispute[9] and all of its proceedings (including extensive expert discovery, a *Markman* hearing, a three-week jury trial on issues of contract, patent, and antitrust, and an appeal and cross-appeal to the Federal Circuit), XY's attorneys' fees surely must be approaching a substantial fraction of the money it has, will, or hopes to recover—suggesting that this lawsuit has become as much a grudge match as a legitimate dispute. Similarly, whether legally justified or not, Trans Ova is admittedly changing some of its royalty accounting practices (*e.g.*, "backing out" items on which it had previously calculated royalty, *see* ECF No. 650-2 at 3), likely hoping to save money, but also provoking legal disputes that may consume in fees what Trans Ova hoped to save in royalties. Neither party can expect that merely going through the motions of conferral will suffice at this point.

To be clear, the opponent of an expected motion cannot hold up that motion unreasonably, in the guise of demanding additional conferral. Under the circumstances of this case, Trans Ova's request for additional time and information was reasonable, whereas XY manifestly took a check-the-box approach to conferral, supported by specious demands of immediacy, so that it could go ahead and file its already-finished motion. XY therefore failed to satisfy D.C.COLO.LCivR 7.1(a). On that basis, the Contempt Motion will be denied without prejudice.

If XY chooses to re-file its motion, the Court expects to see a substantial certificate of conferral demonstrating that XY seriously and in good faith considered Trans Ova's counterarguments and compromise offers (if any). The Court further expects the body of the motion to reflect this conferral, as good faith conferral always

---

[9] XY originally filed this lawsuit on March 5, 2012, in the Western District of Texas. (*See* ECF No. 1-1.)

sharpens the issues for decision.

Moreover, the Court warns Trans Ova that it likewise must take the conferral process seriously—or in other words, to consider seriously that it might lose a subsequent contempt motion. Without prejudging the matter, the Court particularly points out the low likelihood of the Court granting Trans Ova's footnoted request for "additional briefing" regarding "a royalty on the genetic value portion" of certain embryo sales, which Trans Ova now seeks to exclude from the royalty base. (ECF No. 660 at 14 n.9.) Trans Ova itself admits that "this issue . . . has never before been argued" (*id*.), which nearly always counsels *against* allowing it to be argued for the first time at this (very) late stage in the case.[10]

Finally, the Court notes that it has expended an extraordinary amount of time, effort and resources attempting to resolve the parties' myriad disputes over the course of this sprawling, years-long piece of litigation. And, as a consequence, it expects—nay, it demands—that to the maximum extent possible the parties resolve as much of their remaining disputes on their own as they can, leaving it for the Court to decide only those few remaining legal issues which truly only this tribunal can resolve.[11]

---

[10] The Court recognizes that another important motion remains pending: Trans Ova's Opposed Motion for Partial Relief from Amended Final Judgment, arguing that the recent expiration of certain XY patents should relieve Trans Ova of portions of its ongoing royalty obligation. (ECF No. 680.) The Court will reach that motion in due course. If XY wishes to wait to bring any re-filed motion until after it receives the Court's ruling on Trans Ova's motion, the Court would not count that delay as a lack of diligence on XY's part. Nonetheless, when and whether to file such a motion remains in XY's discretion.

[11] A specific example: The Court strongly encourages Trans Ova to stipulate that XY may deposit Trans Ova's royalty checks without waiving any claims XY may have that Trans Ova is underpaying. Trans Ova knows it is obligated to pay *at least* those amounts to XY. Insisting on accord and satisfaction is thus a petty charade, leading to the needless complication of XY petitioning this Court to allow checks to be deposited into the Registry.

**III. CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1.    XY's Motion for Contempt (ECF No. 650) is DENIED WITHOUT PREJUDICE; and

2.    Trans Ova's Motion for Oral Argument (ECF No. 661) is DENIED AS MOOT.

Dated this 6th day of February, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge