**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-0876-WJM-NYW

XY, LLC,

    Plaintiff / Counterclaim Defendant,

v.

TRANS OVA GENETICS, LC,

    Defendant / Counterclaim Plaintiff.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR
PARTIAL RELIEF FROM JUDGMENT**

---

In February 2016, Plaintiff XY, LLC ("XY"), convinced a jury that Defendant Trans Ova Genetics, LC ("Trans Ova"), was infringing ten of XY's patents, and that those patents are valid. (ECF No. 461.) Due to certain jury findings, XY was not entitled to a permanent injunction against Trans Ova's ongoing infringement, so the Court awarded an ongoing royalty. (ECF No. 500 at 21–28.)

Trans Ova appealed the jury's verdict (among other things) and XY cross-appealed the ongoing royalty rates set by the Court (among other things). In May 2018, the Federal Circuit affirmed the verdict and most of the judgment, but vacated the Court's ongoing royalty rates for further consideration. *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282 (Fed. Cir. 2018).

In March 2019, the Court issued an order upwardly revising the ongoing royalty rates. (ECF No. 646.) The Court entered an amended final judgment consistent with that order in April 2019. (ECF No. 648.)

Currently before the Court is Trans Ova's Motion for Partial Relief from Amended Final Judgment.  (ECF No. 680.)  This motion raises the question of the effect on the ongoing royalty rates, if any, of the fact that certain patents-in-suit have now expired. For the reasons explained below, the Court agrees with Trans Ova that the ongoing royalty rates must be reduced.

## I.  BACKGROUND

### A.    Trans Ova's Services & XY's Patents

Trans Ova provides non-human mammalian reproductive services, mostly to cattle farmers.  These services include "semen sorting" (separating bull sperm into X cells and Y cells, so that artificial insemination will produce a calf of a specific gender) and *in vitro* fertilization ("IVF").  (ECF No. 680 at 4.)[1]  Sometimes these services are combined, *i.e.*, IVF is performed with sorted semen.  (*Id.*)  "[S]emen is either sorted fresh ('conventionally-sorted') or is frozen and [later thawed and] then sorted (*i.e.*, 'reverse-sorted')."  (*Id.*)

In either scenario (conventional sorting or reverse sorting), Trans Ova sometimes performs related services, including oocyte collection, also known as "ovum pickup," for which Trans Ova charges an "OPU fee"; and administration, or at least provision, of oocyte stimulation drugs, for which it charges an "IVF drug fee."  (*Id.* ¶ 3.)  "These three services—fertilization, OPU, and IVF drug delivery—are commonly referred to as the 'IVF service cycle.'"  (*Id.*)

XY has several patents covering various aspects of the foregoing.  Beginning in

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs with unnumbered caption pages and exhibits with unnumbered cover pages.

April 2004,

> XY and Trans Ova entered into a five-year licensing agreement ["License Agreement"] . . . under which Trans Ova was authorized to use XY's technology in animal breeding. The Agreement was subject to automatic renewal in April 2009, unless, *inter alia*, Trans Ova was in material breach of the Agreement. XY retained the right to terminate the Agreement in the event of certain breaches by Trans Ova, upon written notice to Trans Ova.
>
> In November 2007, . . . XY sent a letter purporting to terminate the Agreement (Termination Letter) because of alleged breaches by Trans Ova. Trans Ova disagreed with XY's allegations of breach and argued that the Agreement had not been terminated. Over the course of several years, the parties negotiated but failed to resolve their disputes. Trans Ova continued to make royalty payments to XY pursuant to the Agreement, in accordance with its position that the Agreement had not been terminated, but XY declined all payments except one (which XY alleges it accepted in error). During the period of negotiations, XY alleges that it became aware of further breaches by Trans Ova (in addition to those alleged in the Termination Letter), including underpayment of royalties and development of improvements to XY's technology without disclosure of such improvements to XY.

*XY*, 890 F.3d at 1287.

## B.    XY's Three Patent Groupings & the Jury Verdict

XY sued Trans Ova, claiming that Trans Ova breached the License Agreement and was providing services variously infringing certain claims of ten XY patents. At trial, XY presented its patents to the jury and the Court in three groupings:

1.    "Sorting" (meaning conventional sorting): U.S. Patent Nos. 6,149,867; 6,263,745; 6,357,307; 6,524,860; 6,604,435; 6,782,768; and 7,820,425;

2.    "Reverse Sorting": U.S. Patent Nos. 7,713,687 and 7,771,921; and

3.    "IVF with Reverse Sorting": U.S. Patent No. 8,569,053.

(*See* ECF No. 563 at 80–82 (Trial Tr. 727–29); ECF No. 564 at 4–5 (Trial Tr. 784–85);

3

*see also* ECF No. 692-1 ¶¶ 71–72, 145; ECF No. 680 at 4–5.)

Of importance to the questions the Court must currently resolve is the testimony of XY's damages expert, Mr. Todd Schoettelkotte.  In developing an opinion about a reasonable royalty for infringement after the expiration of the License Agreement, he presumed three hypothetical negotiations corresponding to the three above-noted categories:

1.  a negotiation regarding the Sorting patents in November 2007 or April 2009, depending on the jury's view of when the License Agreement terminated, leading to a 15% royalty on services incorporating those patents;

2.  a negotiation regarding the Reverse Sorting patents in May 2010, when the first of those patents issued, leading to a 4% royalty on services incorporating those patents (or 19% on services incorporating both Sorting and Reverse Sorting patents); and

3.  a negotiation regarding the IVF with Reverse Sorting patent in October 2013, when that patent issued, but leading to no additional royalty beyond the foregoing.

(ECF No. 564 at 111–12 (Trial Tr. 891–92); ECF No. 566 at 29–32 (Trial Tr. 929–32); *see also* ECF No. 470 ¶ 4.)  Mr. Schoettelkotte's assumptions and figures eventually led him to propose "total patent damages" of $4,584,555, assuming the License Agreement expired in April 2009.  (ECF No. 566 at 35 (Trial Tr. 935).)

In February 2016, the jury concluded that the License Agreement expired in April 2009 (*see* ECF No. 461 at 1–2; ECF No. 500 at 5–10), and awarded pre-verdict

reasonable royalties of $4,585,000 (*see* ECF No. 461 at 9)—which is manifestly a rounded-up version of Mr. Schoettelkotte's proposal.  The Court interpreted this to mean "that the jury adopted Mr. Schoettelkotte's damages analysis," or in other words, his opinions about both the royalty base (the products and services on which a royalty should be assessed), rates (15% and 4%), and the timing of various hypothetical negotiations.  (ECF No. 500 at 23.)

## C.    Post-Verdict Assessment of an Ongoing Royalty

### 1.    XY's Royalty Motion

For reasons not relevant to relate here, the jury also found that "XY's claims for unjust enrichment and injunctive relief [were] barred by XY's unclean hands."  (ECF No. 461 at 9.)  Thus, XY could not force Trans Ova to stop using its patented technology, but neither was there any indication the Trans Ova would stop.  XY therefore filed its Motion to Set an Ongoing Royalty Rate ("Royalty Motion") (ECF No. 471).  *See also SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 807 F.3d 1311, 1332–33 (Fed. Cir. 2015) ("absent egregious circumstances, when injunctive relief is inappropriate, the patentee remains entitled to an ongoing royalty"), *vacated in part on other grounds*, 137 S. Ct. 954 (2017).

Mr. Schoettelkotte submitted a declaration in support of the Royalty Motion, opining on the outcome of hypothetical licensing negotiations in light of the jury's verdict and other changed circumstances.  (ECF No. 470.)  Although he assumed that the negotiations regarding all ten patents would take place in February 2016 (*id.* ¶ 11), he nonetheless further assumed that the parties would negotiate royalties according to the three patent groupings presented at trial and accepted by the jury (rather than, *e.g.*, a

single royalty covering all ten patents, or an individual royalty for each patent) (*id.* ¶¶ 4, 7, 18).[2]

2.   <u>Trans Ova's Response</u>

Understanding Trans Ova's response to the Royalty Motion requires first understanding its own post-verdict motion practice.  Among the jury's many findings was that both sides breached the License Agreement.  (ECF No. 461 at 1–2.)  The same day that XY filed its Royalty Motion, Trans Ova filed a motion for judgment as a matter of law, arguing that the jury's verdict on the contract issues must be interpreted to mean that XY breached the License Agreement first, thus excusing Trans Ova's supposedly later breach—the upshot of it all being that Trans Ova still had a right to operate under the License Agreement, and therefore a right to practice the XY patents under the License Agreement's terms.  (*See* ECF No. 473.)

With this in mind, Trans Ova responded to XY's Royalty Motion by first arguing that the Court need not engage in any complicated royalty-setting analysis "because, as Trans Ova has repeatedly argued, Trans Ova already has a license to use the technology with a set royalty. . . .  Accordingly, the Court need look no further than the existing license to govern the parties' post-trial business relationship."  (ECF No. 485 at 1; *see also id.* at 3 ("Trans Ova has detailed the reasons that it is still an XY licensee in its other post-trial papers. . . . As such, the License is still in effect, Trans Ova cannot be liable for either breach or patent infringement, and all of XY's damages motions, including its Royalty Motion, are moot.").)

_____

[2] Trans Ova asserts, and XY nowhere disputes, that Mr. Schoettelkotte's declaration (ECF No. 470) mistakenly includes U.S. Patent No. 7,820,425 in the Reverse Sorting category, instead of the Sorting category.  (*See* ECF No. 680 at 4 n.2.)

Alternatively, Trans Ova argued that the ongoing royalty rate should equal the royalty rate under the License Agreement (10%), because that is the rate XY has charged to its other licensees and so it is free from the speculation of hypothetical negotiations, like those proposed by Mr. Schoettelkotte.  (*Id.* at 6–8.)

3.   The Court's Ruling & Final Judgment

The Court rejected Trans Ova's argument that it remained an XY licensee.  (ECF No. 500 at 3–10.)  Accordingly, the Court was required to set an ongoing royalty rate.

All of XY's arguments rested on the principle that the ongoing, post-verdict royalty rates could be no lower than what the jury awarded (15% and 4%).  (*See* ECF No. 471 at 3–4.)  The Court disagreed that ongoing rates must be no lower than the jury-awarded rates.  (ECF No. 500 at 24–25.)  But the Court also rejected Trans Ova's proposal to adopt the License Agreement's 10% rate.  The Court instead awarded the average between License Agreement and the jury award, which worked out to "an ongoing royalty at a rate of 12.5% of gross sales, with an additional royalty of 2% for reverse sorting services."  (*Id.* at 28.)

On April 19, 2016, the Court entered final judgment ("Original Judgment") on the jury verdict and on its ongoing royalty "at the rate of 12.5% of all gross receipts for the licensed products set forth in the parties' prior License Agreement, with an additional 2% royalty for reverse sorting services."  (ECF No. 507 at 2.)  Trans Ova timely appealed to the Federal Circuit (ECF No. 514) and XY timely cross-appealed this Court's decision to set an ongoing royalty rate lower than the rate awarded by the jury for pre-verdict infringement (ECF No. 519).

**D.    Resolution of Royalty Disputes on Remand**

On appeal, the Federal Circuit agreed with XY that this Court erred in its decision to set a royalty rate of 12.5% + 2%, because those rates are lower than the 15% + 4% awarded by the jury for pre-verdict infringement and there were "no economic factors that would justify the imposition of rates that were lower than the jury's." *XY*, 890 F.3d at 1298.  The Federal Circuit endorsed XY's reasoning that, barring "changed circumstances . . . between the date of first infringement and the date of the jury's verdict," the choice to set rates lower than the jury's pre-verdict award would create an "absurd practical result," namely, "that XY would have been better off forgoing the 12.5% ongoing royalty and suing Trans Ova repeatedly for future infringement at the jury's 15% reasonable royalty rate." *Id.* (internal quotation marks omitted).

The Court issued its post-remand order, revising the ongoing royalties, in March 2019 ("Ongoing Royalties Order").  (ECF No. 646.)  The Court found that the rate for the Sorting patents should be 18.75%.  (*Id.* at 11–12.)  As for the two other categories (both of which involve reverse sorting), the Court found that they should carry a 25% premium over the Sorting rate, and the Court embodied that premium in a weighted, blended royalty rate of 12.63% for the entire IVF service cycle—a rate proposed by Mr. Schoettelkotte to account for the fact that Trans Ova had a complicated method of invoicing customers (or not) for various steps in the cycle.  (*Id.* at 12–13; *see also* ECF No. 470 ¶¶ 19–20.)

The Court solicited from XY "a proposed form of amended judgment embodying the Court's rulings." (ECF No. 646 at 13.)  XY submitted its form of judgment on the appointed date.  (ECF No. 647.)  It proposed the following language regarding ongoing

royalties:

> . . . Defendant shall pay to Plaintiff an ongoing royalty for sales commencing on February 12, 2016, at the rate of 12.63% of all gross receipts for *in vitro* fertilization services that utilize reverse-sorted semen (including, but not limited to, revenues Trans Ova receives for each and every step of the *in vitro* fertilization cycle or process, including payments it receives for oocyte retrieval services and *in vitro* fertilization drugs), and at the rate of 18.75% of all gross receipts for all other licensed products set forth in the parties' prior License Agreement.

(*Id.* at 2.)

On April 11, 2019, the Court entered an amended final judgment incorporating the foregoing language drafted by XY verbatim ("Amended Judgment").  (ECF No. 648 at 2.)

## E.      Invalidation and Expiration of the Sorting Patents

Two of XY's Sorting patents expired under their own terms on December 31, 2017, namely, Nos. 6,149,867 and 6,524,860.  The U.S. Patent & Trademark Office invalidated one of XY's Sorting patents (No. 7,820,425), which the Federal Circuit affirmed by unreported disposition on the same day it decided the appeal in this case. *See XY, LLC v. ABS Glob., Inc.*, 723 F. App'x 1000 (Fed. Cir. 2018); *see also XY*, 890 F.3d at 1294.  And XY's remaining Sorting patents expired under their own terms on December 3, 2019, namely, Nos. 6,263,745, 6,357,307, 6,604,435, and 6,782,768.

Trans Ova filed its current motion on December 10, 2019.  (ECF No. 680.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) states,

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Trans Ova moves under paragraph (5), and alternatively under paragraph (6).  (ECF No. 680 at 7.)  Under either alternative, the motion "must be made within a reasonable time."  Fed. R. Civ. P. 60(c)(1).

"[W]hen a district court's Rule 60(b) ruling turns on substantive matters that pertain to patent law," Federal Circuit law applies.  *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1381 (Fed. Cir. 2002).  Because Trans Ova's motion turns on the effect of patents expiring or being invalidated, the Court finds that Federal Circuit law applies.

In the Federal Circuit, as elsewhere, Rule 60(b) motions are addressed to the district court's discretion.  *Id.* at 1381–82.  But that discretion is usually highly restricted. The Federal Circuit apparently has not provided any Federal Circuit-specific interpretation of Rule 60(b)(5), but the regional courts of appeal appear to agree that "a strong showing is required before an injunction or other prospective judgment will be modified."  11 Charles Alan Wright et al., *Federal Practice & Procedure* § 2863 nn.24– 32 and accompanying text (3d ed., Apr. 2020 update) ("*Wright & Miller*").  And "Rule 60(b)(6) is available only in extraordinary circumstances and only when the basis for

relief does not fall within any of the other subsections of Rule 60(b)." *Fiskars*, 279 F.3d at 1382.  Nonetheless, as will become clear below, the Court finds that it need only reach Rule 60(b)(5).

### III.  ANALYSIS

If XY and Trans Ova were arguing over a subsisting licensing agreement, the outcome of this case would likely be beyond question:

- "a patent holder cannot charge royalties for the use of his invention after its patent term has expired," *Kimble v. Marvel Entm't, LLC*, 138 S. Ct. 2401, 2405 (2015);

- "[a]ny attempt to limit a licensee's post-expiration use of the invention, whatever the legal device employed, runs counter to the policy and purpose of the patent laws," *id.* at 2407 (internal quotation marks omitted);

- "[there is] a categorical principle that all patents, and all benefits from them, must end when their terms expire," *id.* at 2413;

- "Congress ha[s] made a judgment: that the day after a patent lapses, the formerly protected invention must be available to all for free.  And further: that post-expiration restraints on even a single licensee's access to the invention clash with that principle," *id.*

According to XY, however, things are different when a royalty rate is embodied not in a licensing agreement, but a court judgment.  XY presents several reasons why it believes this is so.  The Court will address them in turn.  The Court must begin, however, by addressing a running theme in XY's arguments about the relationship

between the parties' former License Agreement and the judgments.[3]

## A.  Whether the Judgment Perpetuated the License Agreement

The License Agreement became effective in April 2004 (ECF No. 690-1 at 2), and, according to the jury, expired in April 2009 (Part I.B, above).  During that time, the License Agreement granted to Trans Ova the right to use XY's "Technology," defined to include, among many other things, patented inventions and inventions subject to a pending patent application that XY, "now or hereafter, owns, controls, licenses, or has an interest in."  (ECF No. 690-1 §§ 1.1, 1.3.)  The royalty rate was 10% of gross receipts regardless of the number of XY patents that Trans Ova might be practicing for a particular process or service.  (*Id.* § 3.1.2.)  In addition, "because of the increasing value of the Technology, . . . the royalty shall not change in the event of any failure or expiration [of any patent] . . . until expiration of the United States patent last issued."  (*Id.* § 3.1.3.)  "In other words," says XY, "the parties' original License was a 'package' deal with a non-diminishing royalty."  (ECF No. 690 at 4.)

The above-quoted Supreme Court language requiring a hard-stop to patent rights upon patent expiration seems to leave no room for exceptions like "package" deals, but the Supreme Court has nonetheless confirmed that "when a licensing agreement covers . . . multiple patents . . . , royalties may run until the latest-running patent covered in the parties' agreement expires."  *Kimble*, 135 S. Ct. at 2408.  Such language appears to provide a space for "a 'package' deal with a non-diminishing royalty" such as the

---

[3] The parties' arguments treat all seven of the Sorting patents as if they have expired, whereas, in reality, six of them have expired and one of them—No. 7,820,425—was declared invalid.  Because that distinction appears irrelevant for present purposes, the Court will not analyze whether the outcome below should be different based on invalidation of the patent as compared to expiration.

License Agreement.  (ECF No. 690 at 4.)  Whether this language truly provides such a space is less clear.  The only example given in *Kimble* was from *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), in which a licensing agreement granted rights to twelve patents "but only seven were incorporated into the machines sold to and licensed for use by [the plaintiffs]."  *Id.* at 30.  The Supreme Court held that it was error to "allow[] royalties to be collected [under the licensing agreement] which accrued after the last of *the patents incorporated into the machines* had expired."  *Id.* (emphasis added).

In this light, when *Kimble* says that "royalties may run until the latest-running patent covered in the parties' agreement expires," 135 S. Ct. at 2408, it appears to assume that the licensee will be using or selling an apparatus or process that incorporates more than one of the licensor's patents, so such use or sale without permission will naturally infringe at least one patent until the latest-running patent expires.  In such a situation, it does not offend the patent laws to agree ahead of time to a single royalty that covers use or sale of the apparatus or process until all the patents that might otherwise be infringed expire—in other words, a royalty that values use or sale of the multi-patented apparatus or process, rather than a royalty that values each patent individually.

It is unclear whether the parties' now-expired License Agreement fit this template, but the Court need not address that issue here.  The important point is that XY believes the License Agreement properly set a non-diminishing royalty.  (ECF No. 690 at 10–11.)  Even more importantly, XY asserts that the Original Judgment was, and the Amended Judgment continues to be, a perpetuation of the License Agreement— meaning that Trans Ova must pay non-diminishing royalties until the last of the ten

patents at issue here expires, in 2022, because the License Agreement says so. (*Id.* at 3 n.1, 5, 6–7, 11.)  Finally, XY claims that the judgments perpetuated the License Agreement because *Trans Ova* successfully argued for that outcome.  (*Id.*)

Taking the last of these assertions first, XY inexcusably distorts the record.  XY says, "Shortly after trial in early 2016, [Trans Ova] expressly argued that the Court should base its ongoing royalty for the ten patents-in-suit on the parties' original License," and "[t]he Court effectively granted [Trans Ova] request to use the original License as a guide, couching the ongoing royalty obligation in terms of the 'Licensed Products set forth in the parties' prior License Agreement.'"  (ECF No. 690 at 6–7 (quoting ECF No. 507 [Original Judgment] at 2).)  However, as described in Part I.C.2, above, Trans Ova argued in its post-trial papers that: (a) the jury improperly found that the License Agreement had ended, meaning Trans Ova was still a licensee, and *for that reason* the License Agreement continued to govern the parties' relationship; or, alternatively, (b) the 10% royalty established in the License Agreement should be the ongoing royalty because it is free of hypothetical-negotiation speculation.  The Court *rejected* both arguments.  There is no good-faith basis for arguing to the contrary.

XY is correct that the Original Judgment required Trans Ova to pay a royalty on "licensed products set forth in the parties' prior License Agreement."  (ECF No. 507 at 2.)  As drafted *by XY* (*see* ECF No. 647 at 2), the Amended Judgment, which remains in force, contains the same phrase (ECF No. 648 at 2).  But neither phrase was inserted due to an argument by, or request from, Trans Ova.  Rather, for convenience, both judgments simply refer to a defined term known to the parties.  The License Agreement defines "Licensed Product(s)," in relevant part, as

> any apparatus, product, process, method, [or] service . . .
> manufactured, used, offered for sale, sold, or otherwise
> developed or commercialized utilizing or resulting from the
> Technology . . . .  Service means application of any portion
> of the Technology . . . to obtain, process, flow sort, use, or
> store semen or spermatozoa, or use sex selected
> spermatozoa for the production of in-vitro or in-vivo embryos
> for a third party.

(ECF No. 690-1 § 1.9.)

Although incorporating a defined term from the License Agreement, XY cannot reasonably argue that either judgment perpetuated the License Agreement.  Most obviously, the Court referred to the License Agreement as the "prior License Agreement."  (ECF No. 507 at 2; ECF No. 648 at 2.)  Just as obviously, the judgments set different rates for different licensed products, as opposed to the License Agreement's uniform 10% royalty.  And XY certainly does not believe that Trans Ova enjoys continued access to the "Technology," defined to include most every form of intellectual property XY has or will obtain during the term of the supposed license-become-judgment.  (*See* ECF No. 690-1 §§ 1.1, 1.3.)

Finally, in a follow-on lawsuit to this one, accusing Trans Ova of infringing later-issued patents, XY clearly stated its understanding that, at a minimum, the judgment was not meant to carry forward the License Agreement's "package" structure:

> Consistent with Mr. Schoettelkotte's analysis, the jury in [this
> lawsuit] assigned the group of six "Sorting Patents" a 15%
> royalty rate and the group of three "Reverse Sorting Patents"
> an additional 4% royalty rate.[4]  These two patent groups
> relate to distinct aspects of XY's sexed semen technology

---

[4] XY's representation that there are six Sorting Patents (not seven) and three Reverse Sorting patents (not two) is immaterial for present purposes.  Moreover, in this passage, XY does not mention the Reverse Sort with IVF group because the jury awarded no damages for that patent group (which is really a single patent), although the Court was later persuaded to award an ongoing royalty—as thoroughly explained in ECF No. 698 at 3–7, 13–15.

> (both with respect to each other, and to the patents at issue
> in the current case).  The dual-rate structure demonstrates
> that the jury determined its damages award, not by valuing a
> "package"-wide license, but rather by valuing the two patent
> groups independently, based solely on the specific patents
> within each group and the universal principle that different
> patents have unique value.

*XY, LLC et al. v. Trans Ova Genetics, LC*, Civil Action No. 17-cv-944-WJM-NYW

(D. Colo.), ECF No. 251 at 12–13 (Aug. 3, 2018).

There is one sense, however, in which the Amended Judgment, like the Original

Judgment before it, operates somewhat like the prior License Agreement.  As noted, XY

presented its patents in three groupings based on the product or service enabled by the

relevant patents: Sorting, Reverse Sorting, and IVF with Reverse Sorting.  (Part I.B,

above.)  Mr. Schoettelkotte presented a pre-verdict damages analysis that tracked

those same groupings and proposed different hypothetical negotiations for each.  (*Id.*)

The jury accepted his analysis.  (*Id.*)  For an ongoing royalty, Mr. Schoettelkotte

continued to opine that the parties would reach different rates based on the three

groupings.  (Part I.C.1, above.)  In both the Original and Amended Judgments, the

Court agreed that the structure pursued by XY and Mr. Schoettelkotte, and adopted by

the jury for pre-verdict damages, should also apply to post-verdict ongoing royalties.

The Court therefore set differing rates for conventional sorting and reverse sorting

*services*, without specific reference to the *patents* associated with those services.

(Parts I.C.3 & I.D, above.)  Thus, from that perspective, both judgments are structured

like the sort of license agreements seemingly endorsed in *Kimble* and *Brulotte*, where a

single apparatus or process implicates multiple patents and the royalty remains valid

until the last of those patents expires.  As implemented in the Amended Judgment,

Sorting services carry an 18.75% royalty, Reverse Sorting services carry a 23.75% royalty (which is either a freestanding 23.75% or the sum of 18.75% and 5%, as discussed below), and Reverse Sorting with IVF services carry a 3% royalty.[5]

Having sorted out all of the foregoing, the Court can now turn to XY's further arguments that expiration of the Sorting patents should have no effect on Trans Ova's current royalty obligations.

**B.    Timeliness**

1.    <u>Failure to Account for Expiration in the Judgment</u>

XY says,

> At the time of the [Original] Judgment, [Trans Ova] was well aware that the ten patents-in-suit would expire at different times . . . .  [Trans Ova] was similarly aware of these facts when the Amended Final Judgment was entered.  Despite multiple opportunities, however, [Trans Ova] failed to appeal any aspect of the ongoing royalty judgment and cannot now use Rule 60(b) to undo that failure.

(ECF No. 690 at 7–8; *see also id.* at 8–10.)  The implication is that it was Trans Ova's duty to argue, prior to entry of judgment, that the judgment must account for the expiration of the various patents, and to appeal if this Court failed to include such a term.

The Court recognizes that, in many circumstances, a district court may not use

---

[5] Consistent with XY's proposal, the Amended Judgment actually lumps Reverse Sorting and Reverse Sorting with IVF into a single category, assigning them a weighted, blended rate of 12.63%.  (ECF No. 648 at 2.)  This rate is based on Mr. Schoettelkotte's proposal of 23.75% for Reverse Sorting and 3% for Reverse Sorting with IVF, adjusted for Trans Ova's profitability in various segments of the IVF service cycle.  (*See* ECF No. 470 ¶¶ 19–20; ECF No. 646 at 12–13; ECF No. 698 at 5–6.)  At a minimum, both parties agree that when the adjustments are backed out (*i.e.*, when the rate becomes un-weighted and un-blended), 23.75% applies to Reverse Sorting and 3% applies to Reverse Sorting with IVF, at least before taking patent expiration into account.  (*Compare* ECF No. 680 at 6, 11 *with* ECF No. 690 at 15–17.)  As will become clear below, the parties dispute whether the 23.75% Reverse Sorting rate is independent of the Sorting rate (18.75%).

Rule 60(b)(5) to relieve a party from judgment when changed circumstances were anticipated and could have been accounted for at the time of judgment.  *See* 11 *Wright & Miller* § 2863 n.28.  But XY has not cited any authority that this principle extends to patent expiration.  Considering the (literally) "categorical" pronouncements from the Supreme Court "that all patents, and all benefits from them, must end when their terms expire," *Kimble*, 138 S. Ct. at 2413, the lack of such authority is probably unsurprising.  It is an established background principle of law, forming a key component of the legal landscape existing at the time the judgments were entered.  XY itself admits that Trans Ova's royalty obligations will end in 2022, when the last of the patents-in-suit expires.  (ECF No. 690 at 3 n.1.)  *That* is no more spelled out in the judgment than any other term related to patent expiration, yet XY finds it inescapable.

Thus, the Court holds that it can (literally) go without saying that an ongoing royalty embodied in a judgment will expire when the patent expires.  In the following subsection, the Court addresses how this holding applies when multiple patents are grouped for liability purposes.  Presently, it is enough to note that Trans Ova neither waived nor forfeited anything by failing to argue, before entry of either judgment, that the judgment should explicitly provide for patent expiration.

2.   <u>Timeliness as Compared to Patent Invalidity and Expiration</u>

XY further asserts that Trans Ova "waived its opportunity to argue for the relief set out in its Motion by sitting silently while patents expired or were held invalid over the last three-and-a-half years."  (ECF No. 690 at 8.)  XY believes that expiration has no effect until 2022, so this argument only makes sense if viewed as an argument to the effect of, "even if Trans Ova is right about patent expiration, it waited too long."  But the

argument is based on an incorrect assumption about Trans Ova's position.

XY says that "[Trans Ova's] argument seems to be the incorrect assertion that a package license with a non-diminishing royalty is somehow legally improper," whereas *Kimble* and *Brulotte* permit at least certain types of "package" licenses.  (ECF No. 690 at 10–11.)  But this is not Trans Ova's argument.  Trans Ova does not dispute package licenses *per se*.  Trans Ova correctly views the Original and Amended Judgments as establishing separate "packages," congruent with XY's arguments at trial and in post-trial briefing.  (ECF No. 680 at 6.)  As Trans Ova explains, "[t]he lapsing of [some but not all of the Sorting] patents did not alter the fact that [Trans Ova's] conventional-sort products still infringed other patents within the Sorting group [until the last of them expired on December 3, 2019]."  (ECF No. 692 at 7.)

From these premises, Trans Ova further asserts that it "had no reason—or basis—to seek partial relief from the final judgment until XY's Sorting patents had all lapsed."  (*Id.* at 4.)  This is not necessarily true, as Trans Ova must realize from the full scope of relief it requests.  Trans Ova not only asks the Court to readjust the royalty rates based on expiration of the seven Sorting patents, but also to prospectively declare the proper royalty rates as the three remaining patents expire.  (ECF No. 680 at 11–12.)  If Trans Ova can request prospective relief as to the unexpired Reverse Sorting and Reverse Sorting with IVF patents, it could have likewise requested prospective relief as to the Sorting patents before their expiration.

Even so, the Court does not find that this counsels against relief.  Again, Supreme Court precedent demonstrates patent expiration has self-executing effects that parties need not address in a license agreement—they simply happen by operation

of law regardless of the parties' awareness or intentions—and the Court holds that parties likewise need not anticipate expiration in a judgment.  In that light, Trans Ova could have simply stopped paying Sorting royalties on December 4, 2019.  However, considering that it was already facing a motion from XY arguing that Trans Ova should be held in contempt for undercalculating royalties (ECF No. 650),[6] and considering the parties' competing views of the judgment and royalty structure (as discussed above and below), the Court is not surprised that Trans Ova reversed the old adage and decided it was better to seek permission than forgiveness.

In short, although Trans Ova need not have waited until after the expiration of the Sorting patents to bring its motion, that expiration date is nonetheless a logical point after which to request relief.  Trans Ova brought its motion one week later.  Accordingly, Trans Ova brought its motion "within a reasonable time."  Fed. R. Civ. P. 60(c)(1).

## C.    Reverse Sort Royalty Rate

The foregoing establishes that the expiration of the Sorting patents must have an effect, and so the Court finds that Rule 60(b)(5) relief is appropriate.  The parties hotly contest with that relief should be.

Trans Ova argues that the effect of the Sorting patents' expiration is that Trans Ova pays nothing on conventional sorting at all, meaning both that it need not pay on conventional sorting and that it need not pay the conventional sorting component of Mr. Schoettelkotte's 12.63% royalty for reverse sorting.  (ECF No. 680 at 11.)  In Trans Ova's view, 12.63% is derived from three distinct rates—18.75% for conventional

---

[6] XY's undercalculation arguments have nothing to do with Trans Ova's position on the effect of the Sorting patents' expiration.  The Court denied XY's motion without prejudice.  (ECF No. 698.)

sorting, an additional 5% for the added value of reverse sorting (*i.e.*, the ability to use previously frozen semen), and another 3% for IVF-related services—which were then blended and weighted according to revenue, as calculated by Mr. Schoettelkotte. According to Trans Ova's expert, if one removes the 18.75% component and then applies Mr. Schoettelkotte's formula to the remaining 5% and 3% figures, the rate becomes 3.93%. (ECF No. 681 ¶¶ 8–9 & Table 1a.)

XY nowhere argues that Trans Ova's expert misunderstood or incorrectly applied Mr. Schoettelkotte's mathematical model. XY instead argues that a key premise of Trans Ova's position is wrong, and so its expert's math is garbage-in-garbage-out. Specifically, XY denies that the reverse sorting royalty is a 5% add-on to the 18.75% royalty for conventional sorting. Rather, says XY, the reverse sorting rate is a freestanding 23.75% that would not change even if expiration of the Sorting patents matters. (ECF No. 690 at 16.) XY says this is indisputable from Mr. Schoettelkotte's post-trial declaration in support of ongoing royalties, where he lists a proposed ongoing reverse sorting royalty of 23.75%, which is a 25% increase over the jury's pre-verdict royalty of 19%. (*See id.*; *see also* ECF No. 470 at 12, 14.) Mr. Schoettelkotte has also submitted a new declaration pointing to the same thing as evidence that Trans Ova's expert misunderstood his opinion. (ECF No. 690-5 ¶ 9.)

The fact that Mr. Schoettelkotte used the 23.75% figure, rather than explicitly breaking out 18.75% and 5%, proves nothing. In his previous declaration, Mr. Schoettelkotte stated that "the starting points for [his post-verdict hypothetical negotiation] analysis are the following: 15% for the Sorting Patents, [and] 4% for the Reverse Sorting Patents." (ECF No. 470 ¶ 7.) He then went on to propose

> an increase of between 25% and 50% above the jury's
> adjudged royalty rates.  Specifically, the 15% royalty rate
> related to the Sorting Patents would be increased to an on-
> going royalty rate of between 18.75% [a 25% increase] and
> 22.5% [a 50% increase].  The 4% royalty rate related to the
> Reverse Sorting Patents would be increased to an on-going
> royalty rate of between 5% [a 25% increase] and 6% [a 50%
> increase].

(*Id.* ¶ 20.)

This passage demonstrates that Mr. Schoettelkotte was thinking of these royalties, and calculating their post-verdict enhancements, separately.  Thus, when Mr. Schoettelkotte later proposes 23.75% for reverse sorting, labeling it a "25% Increase" over the "Jury Verdict" of 19%, this statement provides no support that he viewed either 19% or 23.75% as a freestanding royalty, as compared to the sum of 15% + 4% and 18.75% + 5%, respectively.  Indeed, even if Mr. Schoettelkotte had not made his separate consideration so clear earlier in his declaration, the distributive property of mathematics makes $19 + (19 \times 0.25)$ exactly equivalent to $(15 + (15 \times 0.25)) + (4 + (4 \times 0.25))$.  They both sum to 23.75, so listing the royalty rate as "23.75%" says nothing, of itself, about whether Mr. Schoettelkotte (or anyone) viewed it is a unitary rate or the sum of two separable rates.

In any event, Mr. Schoettelkotte's trial testimony eliminates all doubt that he viewed the Sorting and Reverse Sorting rates as separable.  Consider the following exchange between XY's counsel and Mr. Schoettelkotte:

> Q.     . . . Under your analysis and opinion, is that the right
>         outcome of this case if there's infringement?
>
> A.     What I am showing here on the screen would be the
>         right outcome of this case if there was infringement,
>         and that would be a royalty rate of 15 percent on the
>         sorting patents and 4 percent on the reverse sorting

patents.

Q.     A total of 19 percent?

A.     That's correct, *on the products that use both reverse sorting and sorting patents.*

(ECF No. 566 at 32 (Trial Tr. 932) (emphasis added).)

The separability of the rates is also evident in how Mr. Schoettelkotte calculated his total pre-verdict royalties figure of $4,584,555.  (*See* Part I.B, above.) Mr. Schoettelkotte explained to the jury that this figure is the sum of: (i) an assumed $750,000 up-front license fee; (ii) $3,139,945, which is 15% of Trans Ova's relevant revenue derived from the Sorting patents; and (iii) $694,610, which is 4% of Trans Ova's relevant revenue derived from the Reverse Sorting patents.  (ECF No. 566 at 34–35 (Trial Tr. 934–35).)  As to that third figure, Mr. Schoettelkotte further described it as "the *total royalty damages* for those reverse sort patents." (*Id.* at 35 (Trial Tr. 935) (emphasis added).)  And, notably, Mr. Schoettelkotte did *not* say that the 4% royalty was *on top of a 15% royalty that would also be collected.*  To the contrary, he testified that the relevant revenue on which a reverse-sort royalty should be assessed was $17,365,261, and he multiplied that number by 4% (not 19%), yielding $694,610.  (*Id.*) In short, Mr. Schoettelkotte always treated these rates separately, and he perpetuated that treatment into post-trial briefing.

XY fully adopted Mr. Schoettelkotte's approach in its motion to set an ongoing royalty rate because, it said, "the jury fully adopted XY's [*i.e.*, Mr. Schoettelkotte's] damages model for patent infringement, and this constitutes the baseline for setting an ongoing royalty." (ECF No. 471 at 5; *see also id.* at 5–10.)  The Court, in turn, accepted Mr. Schoettelkotte's proposal of ongoing royalties at rates (plural) that are 25% above

those assessed by the jury.  (ECF No. 646 at 10–13.)

XY contends, however, that Trans Ova's current argument reflects an "unspoken and mistaken assumption . . . that the majority of the value of reverse sorting must derive solely from the now-expired Sorting Patents."  (ECF No. 690 at 14.)  According to XY, the error in this view can be seen from two perspectives.  First,

> [t]he basic sorting steps are, in fact, claimed and covered by the Reverse Sort patents.  For example, claim 1 of U.S. Patent No. 7,713,687 includes the steps of "determining the sex characteristic of a plurality of sperm cells" and "separating sperm cells separated according to the determination of their sex."  Because the sorting steps are claimed and covered by the reverse sort patents, the expiration of the Sorting Patents does not affect the value [Trans Ova] derives from the reverse sort patents.  Thus, the value of the Reverse Sort patents is extinguished only when the reverse sort patents expire and no sooner.

(*Id.* at 14–15 (citation omitted).)  Second,

> [a]nother way to look at this is to consider the ongoing royalty as an alternative to an injunction.  If [Trans Ova] had been enjoined from practicing the Reverse Sort patents, it would be unable to provide any of its reverse sort services at all, both before and after the expiration of the Sorting Patents.  Because expiration of the Sorting patents does not diminish the scope of prohibited "reverse sort" activities, the reverse sort royalty should also remain undiminished.

(*Id.* at 15.)

The problem with both arguments is that they *assume* the value of the Reverse Sorting patents is a freestanding 19% (pre-verdict) and 23.75% (post-verdict).  Perhaps it could have been.  Mr. Schoettelkotte testified, and the jury accepted, that reverse sorting was valuable to Trans Ova because it enabled it to operate a "hub and spoke" model, rather than only being able to sort semen produced near its facilities.  (*See* ECF No. 690 at 17.)  Perhaps that is worth 19% in a pre-verdict world and 23.75% in a post-

verdict world, even when the innovations needed to effectively sort the semen after thawing are no longer patent-protected.  But that is simply not what Mr. Schoettelkotte opined, or XY argued.  Rather, XY

- convinced the jury that the value of reverse sorting to Trans Ova is 4% of reverse sorting revenues, and only rises to 19% (15% + 4%) "on the products that use both reverse sorting and sorting patents" (ECF No. 566 at 32 (Trial Tr. 932)); and

- convinced the Court that the same structure adopted by the jury should be employed for ongoing royalties, but with each royalty enhanced by 25% (ECF No. 471 at 5; ECF No. 646 at 10–13).

Notably, XY itself cannot avoid referring to the ongoing Reverse Sorting royalty as "a 5% premium <u>over and above</u> the 18.75% 'basic' rate."  (ECF No. 690 at 16 (emphasis in original).)  For XY, this somehow means that "the ongoing royalty for the reverse sort patents is not 5%, but 23.75%."  (*Id.*)  But XY and Mr. Schoettelkotte have never argued—not even now—that "the 5% premium" (or the 4% pre-verdict rate) was proposed under the assumption that XY would always be collecting the "basic" rate as well.  Indeed, that would contradict Mr. Schoettelkotte's explicit premise that the "basic rate" and the "premium" are collected together only "on the products that use both reverse sorting and sorting patents."  (ECF No. 566 at 32 (Trial Tr. 932).)

Accordingly, whatever XY now wishes it argued, what it *actually* argued all along is that the Reverse Sorting royalties of 4% (pre-verdict) and 5% (ongoing) reflect what the parties would have agreed upon in a hypothetical negotiation specifically about the Reverse Sorting patents, independent of the value of the Sorting patents.  *XY, LLC et*

*al. v. Trans Ova Genetics, LC*, Civil Action No. 17-cv-944-WJM-NYW (D. Colo.), ECF No. 251 at 12–13 (Aug. 3, 2018) ("[c]onsistent with Mr. Schoettelkotte's analysis, . . . the jury determined its damages award . . . by valuing the two patent groups [Sorting and Reverse Sorting[7]] independently, based solely on the specific patents within each group").

For this reason, the Court agrees with Trans Ova that the Sorting royalty may no longer be assessed now that the Sorting Patents have expired.  The Court further accepts Trans Ova's unchallenged assertion that, after backing out the 18.75% Sorting component, the weighted, blended Reverse Sort royalty fell to 3.93% as of December 4, 2019.

Trans Ova further asserts that the IVF with Reverse Sorting patent (No. 8,569,053) expires on January 14, 2022, meaning, as of the following day, Trans Ova no longer owes the component of the weighted, blended 12.63% rate awarded in the Amended Final Judgment representing the OPU and IVF drug components of the IVF service cycle—or in other words, the 3.93% rate becomes unweighted and unblended and reverts to 5%, representing the Reverse Sorting patents alone.  (ECF No. 680 at 11–12.)  XY does not challenge this assertion and is therefore deemed to confess it.

Finally, XY concedes that all ongoing royalty obligations end with the expiration of the last Reverse Sorting patent.  (ECF No. 690 at 3 n.1.)  The relevant expiration date is May 21, 2022, meaning that Trans Ova's ongoing royalty obligations end completely as of May 22, 2022.  (ECF No. 680 at 12.)

---

[7] *See* n.4, above.

**D.     XY's Remaining Arguments**

XY argues that the foregoing cannot be the proper result because it puts Trans Ova, an adjudged infringer, in a better position than XY's licensees, all of whom are paying 10% until the last relevant patent expires.  (ECF No. 690 at 12–13, 15.)  In this same vein, XY further argues that, in any hypothetical licensing negotiation in February 2016, XY never would have agreed to a license that diminished based on patent expiration.  (ECF No. 690 at 12–13.)  The Court finds these arguments unpersuasive for the following reasons.

First, Trans Ova is not in a better position.  The Amended Judgment gives Trans Ova the right to practice up to ten of XY's patents, nothing more.  XY's licensees have a right to XY's entire IP portfolio (including yet-to-be-invented innovations) along with all the other protections of a formal license agreement.  (*See* ECF No. 692 at 9 n.6.)

Second, XY itself argued throughout this case that the ten relevant patents fall into three distinct groups, each bearing a separate royalty.  That is already different from any license agreement XY or Trans Ova has shown to the Court.  But the jury accepted XY's approach and XY has repeatedly stated that the Court must follow the jury's lead—which it has.  (ECF No. 471 at 4, 5; ECF No. 505 at 2; ECF No. 592 at 6–7; ECF No. 651 at 9.)

Third, XY drafted the Amended Judgment.  As experienced patent counsel, XY's attorneys surely knew of *Kimble* and *Brulotte*.  Nonetheless, XY failed to propose any language for the judgment that might create a valid non-diminishing royalty until the expiration of the last patent-in-suit.

In any event, fourth, it is unclear whether the Court *could* have structured the

judgment to impose a non-diminishing royalty until the expiration of the last patent-in-suit. *Kimble* and *Brulotte* nowhere condone the idea that separate royalty rates for separate patent groupings covering separate services can nonetheless be combined into a single super-rate that remains in force even after a group of those patents expires.

For all these reasons, the Court rejects XY's attempts to portray the Amended Judgment as more favorable to XY than it actually is.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Trans Ova's Opposed Motion for Partial Relief from Amended Final Judgment (ECF No. 680) is GRANTED; and

2.  The Clerk shall enter a Second Amended Final Judgment consistent with this order.

Dated this 5th day of May, 2020.

BY THE COURT:

William J. Martinez
United States District Judge